THE PEOPLE OF THE STATE OF NEW YORK, Appellants, *v.* WILLIAM C. STEPHENS et al., Respondents.

THE SAME APPELLANTS *v.* JOHN LEAHY et al., Respondents.

The Legislature has power to relinquish a claim of the State, or to w its remedies for a fraud.

In an action by the Attorney-General, on behalf of the State, upon a claim against a citizen, it is not necessary to the defense to show a technical release ; it is sufficient to show that the Legislature has, in some form, expressed an intention that the action shall not be prosecuted.

Where the State comes into court as a party in a controversy with an individual, the intent of the Legislature, in any action it may have taken in respect to the controversy, may be ascertained, and may be construed in the light of surrounding circumstances.

The State, in its contracts with individuals, must be judged and must abide by the same rules which govern in similar cases between individuals ; and whenever such a contract comes before the courts, the rights and obligations of the contracting parties will be adjusted upon the same principles as if both contracting parties were private persons.

In the absence of fraud or collusion, the acts of public officers acting on behalf of the State, within the limits of the authority conferred upon them, and in the performance of their duties, in dealing with third persons, are the acts of the State, and cannot be repudiated by it.

*It seems,* that, under the Revised Statutes, the canal commissioners, in whom was vested " the general care and superintendence of the canals," (2 R. S., 219, § 9), had power to arrest and prevent the performance of any work at unusual and extravagant prices, and the performance of contracts procured by fraud and prejudicial to the interests of the State.

The rule condemning as unlawful combinations to prevent bidding at auction sales, is applicable to proposals for government work in response to a call therefor with a view to a contract with the lowest bidder, and a combination of contractors under and by which the privilege of bidding for the work is secured by one, without competition, is against public policy and illegal, and if it results in a letting at unreasonable prices authorizes a rejection of the proposal or a repudiation of the contract.

Where, however, the contracting board having full power to act for the State, and to reject proposals in case they deem them disadvantageous to the State, with full knowledge of all the facts, adjudges a proposal not excessive in price or disadvantageous to the State, accepts it, and enters into a contract in pursuance of it, in the absence of any evidence that the board acted corruptly or *mala fide,* the State is bound, and cannot maintain an action to recover damages for the illegal combination,

Statement of case.

In an action by the State to recover damages alleged to have been sustained by reason of an illegal combination of contractors, for the purpose of preventing competition at a letting of contracts for canal repairs, whereby the State was induced to contract for the work at excessive prices, the following facts appeared. The bids were put in December 28, 1866; the combination became public in a few days thereafter. At the beginning of the session of the Legislature of 1867, it became a subject of discussion therein, and by joint resolution a committee was appointed to investigate matters connected with the canals. The committee reported at the opening of the session of 1868, setting forth in detail the frauds alleged in the complaint. At that session, an act was passed (chap. 869, Laws of 1868), authorizing the Attorney-General to bring actions to set aside the contracts, and to recover moneys paid thereunder in excess of the fair value of the work and materials in case the fraud was established. In pursuance of such resolution, one action was brought which was pending when the act of 1870 (§§ 3, 4, chap. 55, Laws of 1870), was passed, authorizing the canal board, on recommendation of the canal commissioners, when they should deem it to the interest of the State, to cancel and annul any contract for canal repairs, and providing that the contractor whose contract was annulled should be entitled to receive money earned, etc. In the meantime the contractors had proceeded with the performance of their contracts with the assent of the State officers in charge of the canals, and had been regularly paid for their work as prescribed by their contracts, and in on case the contractor had, under a joint resolution of the Senate and Assembly, been required to proceed with the work under his contract. Defendants' contracts were not annulled; they proceeded with them to their completion, and received the contract prices; *held*, that the act of 1870 was intended as a final disposition of the whole matter, and as a waiver of any claim for fraud, and operated to validate the letting and to ratify the contracts subject to the power therein conferred, to annul them; that by omitting so to terminate them, and by going on under them, the State officers clearly manifested that they did not deem the contracts injurious, and elected, on behalf of the State, to proceed with and abide by them; that the legislative intent and the action of the State, through its authorized officers, was binding upon the courts and the State, and that this action was not maintainable.

Also, *held*, that the facts that the contracts were partially performed at the time of the discovery of the fraud, and that the State could not restore the contractors to their original position, did not require that the State, in order to obtain relief, should suffer the contracts to be completed, and then sue for damages; that it could repudiate the contracts on discovery of the fraud without waiving its right to recover damages; and that a continuance of the contracts after full knowledge of the fraud, under circumstances entitling the contractors to the stipulated compensation, and a voluntarily payment of the same was, in the absence of any evidence of bad faith, incompetency or negligence on the part of the State officials, a waiver of the fraud.

*It seems,* that payments voluntarily made under an executory contract between individuals for work and labor with full knowledge of facts upon which fraud in the inception of the contract might have been claimed, cannot be recovered back, or damages recovered for the fraud. *Whitney* v. *Allaire* (4 Denio, 354, *S. C.,* 1 Com., 305) distinguished and limited.

*Thorn* v. *Helmer* (4 Abb. Ct. of Appeals Dec., 408; *S. C.,* 2 Keyes. 34); *Mallory* v. *Leach* (35 Vt., 156) distinguished.

(Argued June 6, 1877; decided January 15, 1878.)

APPEALS from judgments of the General Term of the Supreme Court, in the third judicial department, in favor of defendants entered upon orders denying motions for new trials, and directing judgments upon orders nonsuiting plaintiffs upon the trials.

These actions were brought to recover damages alleged to have been sustained by the people in consequence of a fraudulent and unlawful combination and conspiracy between defendants, to prevent competition and to deceive the Contracting Board, in letting repair contracts for certain sections of the State canals, and to induce, and which did induce, the letting of the contracts at excessive prices. In the case last entitled it was also alleged that five bids were put in ostensibly by different persons, and falsely represented by defendant Lord to be *bona fide* bids, when, in fact, they were all put in by him, he having previously bought off all competition, and which had been mutilated, so as not to conform to regulations, with intent that they should be rejected.

The facts appear sufficiently in the opinions. Plaintiffs were nonsuited in both cases, to which plaintiffs' counsel duly excepted. Exceptions were ordered to be heard at first instance at General Term.

*Matthew Hale* and *E. W. Paige,* for appellants. Plaintiffs were not precluded from maintaining this action, because they did not act immediately upon discovery of the fraud. (*Allaire* v. *Whitney,* 1 Hill, 484; *Whitney* v. *Allaire,* 4 Den. 554; 1 N. Y., 305; *Thorn* v. *Helmer,* 4 Abb. Ct. App., Dec., 408, 415: 2

Statement of case.

Keyes, 27, 34; *De Graw* v. *Elmore*, 50 N. Y., 3; *Miller* v. *Barber*, Ct. of Appeals, 1876; *Newberry* v. *Garland*, 31 Barb., 122, 128; *Pullman* v. *Alley*, 53 N. Y., 637, 638; *Ross* v. *Titterton*, 6 Hun, 280, 285; *Mallory* v. *Leach*, 35 Vt., 156, 169, 172; *Kelley* v. *Pember*, id., 185; *Kellogg* v. *Denslow*, 14 Conn., 411, 420, 424, 425; *Freeman* v. *Baker*, 5 Carr & P., 475; *Peek* v. *Gurney*, 6 H. L., 377; see judgment of Lord CHELMSFORD, 384; see judgment of Lord CAIRNS, 402; *Clarke* v. *Dickson*, E. B. & E., 148, 150, 153; *Western Bank* v. *Addie*, 1 H. L., 167; *Hastings* v. *McGee*, 66 Penn. St., 384; *Rice* v. *Olin*, 79 id., 396; *Groff* v. *Hansel*, 33 Md., 164–170; *Junkins* v. *Simson*, 2 Shep., 364; *Love* v. *Oldham*, 22 Ind., 51; *Gray* v. *Rich*, 10 id., 430; *McLaren* v. *Long's Adminis.*, 25 Geo., 708; *Platt* v. *Condit*, 22 Ark., 454; *Ward* v. *Reynolds*, 32 Ala., 385, 393; *Bacon* v. *Brown*, 4 Bibb [Ky.], 91; *Harrington* v. *Stratton*, 22 Pick., 510; *Kimball* v. *Cunningham*, 4 Mass., 502, 505; *Herbert* v. *Ford*, 29 Me., 553; *Herrin* v. *Libbey*, 36 id., 350; *Pierce* v. *Wood*, 3 Fost., 510, 534; *Withers* v. *Greene*, 9 How. [U. S.], 220; *Henckley* v. *Hendrickson*, 5 McLean, 170; *Peck* v. *Brewer*, 48 Ill., 55; *Gifford* v. *Carvill*, 29 Cal., 583; Kerr on Fraud and Mistake [Bump's Am. ed.], 330; Story on Sales, §§ 437, 458 *a;* 1 Bedarride Sur. Dol., 248; Sedgwick on Dam., 339.)  By the mere act of suing for damages for the deceit, the State affirmed the contract, and from that time forward both parties are bound by its terms.  (*Miller* v. *Barber*, Ct. of App.; *Kimball* v. *Cunningham*, 4 Mass., 502, 505, 506; *Mallory* v. *Leach*, 35 Vt., 156, 171; *Kellogg* v. *Denslow*, 14 Conn., 411, 423; *Hastings* v. *McGee*, 66 Penn. St., 384, 387; *Junkins* v. *Simson*, 2 Shep., 364; *Bacon* v. *Brown*, 4 Bibb [Ky.], 91, 93; *Mullet* v. *Mason*, L. R., 1 C. P., 559; *Jeffrey* v. *Bigelow*, 130 O. R., 518; *Smith* v. *Green*, L. R., 1 C. P., 92; *Sharon* v. *Mosner*, 17 Barb., 518; *Schell* v. *Plumb*, 55 N. J., 592; *Selway* v. *Fogg*, 5 M. & W., 83; *S. and S. R. R. Co.* v. *Row*, 24 W. R., 74.)  The unlawful combination, and the manner in which the proposals for the work were put in, was such fraud as was

actionable.  (*Veazie* v. *Williams*, 8 How. [U. S.], 134; *Bex-well* v. *Christie*, Cowp., 395; *Howard* v. *Castle*, 6 T. R., 642; *Curtis* v. *Aspinwall*, 114 Mass., 191; *Towle* v. *Leavitt*, 3 Foster, 360; *Thust* v. *Delaplaine*, 3 E. D. S., 219; Kerr on Fraud and Mistake [Bump's ed.], 53, 92, 93, 225 and note; *Wheeler* v. *Collier*, 1 M. & W., 126; *Gulick* v. *Ward*, 5 Halst., 92; *Green* v. *Baverstock*, 14 C. B. [N. S.], 204; *Mortimer* v. *Bell*, L. R., 1 Ch. App., 10.)  Fraud coupled with damage will sustain the action.  (*Upton* v. *Vail*, 6 J. R., 181; *Barney* v. *Dewey*, 13 id., 224; *Monell* v. *Colden*, id., 395; *Culver* v. *Avery*, 7 Wend., 380; *Jones* v. *Caswell*, 3 J. Cas., 32; *Thompson* v. *Davies*, 13 J. R., 112, 114; *Gulick* v. *Ward*, 5 Halst., 87; *Shiffen* v. *Stickney*, 3 Met., 334; *Atcheson* v. *Mallon*, 43 N. Y., 147; *Woodworth* v. *Bennett*, id., 273; *Marsh* v. *Russell*, 2 Lans., 340, 344; *Gardener* v. *Morse*, 25 Me., 140; *Doolin* v. *Ward*, 6 J. R., 194; *Wilbur* v. *How*, 8 id., 346; *Brisbane* v. *Adams*, 3 N. Y., 129; *Addington* v. *Allen*, 11 Wend., 382; *Green* v. *Dixon*, 23 Beav., 535; *Gale* v. *Gale*, 19 Barb., 251.)  There was fraud, and a direct violation of the laws of the State.  (Const. 1854, art. 7, § 3; Laws 1854, ch. 329, §§ 8, 9; 3 Stat. at Large, 183; Laws, 1857, ch. 105, § 1; 3 Stat. at Large, 190; Laws 1862, ch. 348; 3 Stat. at Large, 204; *Woodworth* v. *Bennett*, 43 N. Y., 275; Whart. Cr. Law [Am. ed.], 688, 689; *People* v. *Fisher*, 14 Wend., 9; *Rex* v. *Tarrant*, 4 Burr., 2106; *Rex* v. *Seward*, 1 Ad. & El., 706; Add. on Torts, 1, 31, 32, 590; *Gregory* v. *Duke of Brunswick*, 6 M. & Gr., 205; *Jones* v. *Baker*, 7 Cow., 445; 1 Hil. on Torts, 94; *Rigby* v. *Hewitt*, 5 Exch., 243.)  The judgment in the action against Stephens & Gale could not be a bar to this action, unless it was shown that the issue in this action was determined in that. (*Stowell* v. *Chamberlain*, 60 N. Y., 272, 276, 277, 278; Story's Eq. Jur., §§ 794–799; 1 Greenl. Ev., § 530; *Lawrence* v. *Hunt*, 10 Wend., 80; *Vaughn* v. *O'Brien*, 57 Barb., 491, 494; *Russell* v. *Place*, U. S. S. C., Oct., 1875; *House* v. *Mullen*, 22 Wal., 42; *Packet Co.* v. *Sickles*, 5 id., 580–590; 24 How. [U. S.], 333, 344–348; *Aiken* v. *Peck,*

22 Vt., 260; *Carter* v. *James*, 13 M. & W., 137; *Colwell* v. *Bleakley*, 1 Abb. Ct. App., 400; 1 Keyes, 62; *Davis* v. *Talcott*, 14 Barb., 619; *Geisler* v. *Weigand*, 9 N. Y., 232; *Swett* v. *Tuttle*, 14 id., 465; *O'Connor* v. *Bagley*, 3 E. D. S., 149; *Smith* v. *Sherwood*, 4 Conn., 276; *Hitchen* v. *Campbell*, 2 Wm. Black, 778, 827; 3 Wils., 240, 304; *Griffin* v. *Seymour*, 16 Iowa, 30; *Estes* v. *Larsh*, 21 Ind., 190; *Birch* v. *Funk*, 2 Metc. [Ky.], 544; *Many* v. *Harris*, 2 J. R., 24; *Brintnall* v. *Foster*, 7 Wend., 103; *Legg* v. *Legg*, 8 Mass., 99.) If that judgment was good as an estoppel, it was only so in favor of Stephens & Gale. (*Lansing* v. *Montgomery*, 2 J. R., 382; *Sprague* v. *Waite*, 19 Pick., 455, 458; *McClelland* v. *Ridgway*, 12 Ala., 482; *Rose* v. *Oliver*, 2 J. R., 365; 2 Add. on Torts [Bank's ed.], 1131; 1 Greenl. Ev., §§ 523, 524, 536, 537; Bigelow on Est., 57; *Williams* v. *Sutton*, 43 Cal., 65; 2 Phil. Ev., 54; 2 Starkie Ev., 195, 196, note 1; Norris' Peake, 73; Bull N. P., 232.) The former judgment was not properly pleaded. (*Krekeler* v. *Ritter*, 62 N. Y., 373; *Medbury* v. *Swan*, 46 id., 200; *Beach* v. *Lawrence*, 64 Barb., 506; 53 N. Y., 200.) The order sustaining the demurrer, without the entry of final judgment, was no estoppel. (Buller's N. P., 232, 234; 1 Phil. Ev., 389; C. & H. Notes, 1070; *Leonard* v. *Barker*, 5 Den., 221, 225; Bigelow on Estoppel, 25, 26; 1 Greenl. Ev., § 510; 2 Rol. Abr., 679 *a*, 3; 2 Bibb, 60; 1 Overt., 94; 3 Hawkes, 36, 187; 1 N. C. [L. R.], 94, 376; 1 Const. [C. R.], 471; 1 H. & J., 253, 505; 2 Binn., 70; 6 id., 430; *Fisher* v. *Kitchingman*, Willes, 367; 1 Stra., 162; 3 Robt., 615; *Ludlow* v. *Johnston*, 2 Ham., 553; *Croswell* v. *Byrnes*, 9 J. R., 287.) The negligence or laches of a public officer will not be imputed to a government, State or national. (*U. S.* v. *Kirkpatrick*, 9 Wheat., 720; *People* v. *Russell*, 4 Wend., 570; *Seymour* v. *Van Slyck*, 8 id., 403; *Dutch Church* v. *Fedder*, 14 id., 165; *Looney* v. *Hughes*, 26 N. Y., 519, 522.) The State is not bound by the acts of its agents, unless it manifestly appears that the agent was acting within the scope of his authority. (*Whiteside* v. *U. S.*, 15 Alb. L. J., 193.)

*Rufus W. Peckham*, for respondents.   No cause of action was proved against either defendant, assuming them both connected by the evidence with the transaction at Stanwix Hall, as that transaction and the subsequent letting of the contract were not sufficient in law to render them liable. (*Atcheson* v. *Miller*, 43 N. Y., 147; *Woodworth* v. *Bennett*, id., 273; 24 Ohio St., 565; Kerr on Fraud, 224; *Jones* v. *North*, L. R., 19 Eq., 426; *Hooker* v. *Vandewater*, 4 Den., 349; *Stanton* v. *Allen*, 5 id., 434; *Marsh* v. *Russell*, 2 Lans., 340; 1 Story's Eq., § 205; Will. Eq. [Potter's ed.], 150, 177; *Laidlaw* v. *Organ*, 2 Wheat., 178; 13 Alb. L. J., 162; 2 Kent, 490, 491.)   The facts proved were not sufficient to connect either of the defendants with any combination, and the nonsuit was proper.   (*Jaeger* v. *Kelly*, 52 N. Y., 274; *Baulec* v. *N. Y. and H. R. R. Co.*, 59 id., 356; *Pleasants* v. *Faut*, 22 Wall., 116–120; 15 Alb. L. J., 204; L. R., 4 Exch., 32, 39; L. R., 2 P. C., 317, 335.)   The defendant Lord was entitled to have the whole of his admission taken together.   (*Ins. Co.* v. *Newton*, 22 Wall., 32.) Plaintiffs were properly nonsuited, because after full knowledge of the alleged fraud, they elected to continue the contract, and thereby caused the alleged damages.   (*Brown* v. *Mayor, etc.*, 63 N. Y., 244, 545; *Hastings* v. *McGee*, 66 Penn. St., 384; *Ross* v. *Titterton*, 6 Hun, 281; *Kellogg* v. *Denslow*, 14 Conn., 411; *Waring* v. *Mason*, 18 Wend., 425; *Withers* v. *Green*, 9 How. [U. S.], 213; *Clark* v. *Dickson*, E. B. & E., 148; *Campbell* v. *Fleming*, 1 Ad. & E., 40; *Goff* v. *Hansell*, 3 Md., 161; *Love* v. *Oldham*, 22 Ind., 51; *Kelly* v. *Pember*, 35 Vt., 183; *Mallory* v. *Leach*, id., 156; Sedgwick on Dam. [4th ed.], 338, 339; *Minturn* v. *Mann*, 7 N. Y., 220; *Sweetman* v. *Prince*, 26 id., 224; *Frost* v. *Sar. Mut. Ins. Co.*, 5 Den., 154; *S. and S. R. R. Co.* v. *Rowe*, 24 Wend., 74; *Selway* v. *Fogg*, 5 M. & W., 83; *Harris* v. *Ins. Co.*, 3 Hun, 724; 13 Alb. Law Jour., 248; *Ilion Bank* v. *Carver*, 31 Barb., 230, 236; *Reed* v. *Randall*, 29 N. Y., 515; 53 id., 515; 58 id., 358; 60 id., 540; *Mason* v. *Bovet*, 1 Dev., 69; *Neblett* v. *Macfarland*, 92 U.

S., 101, 104; *Hammond* v. *Pennock*, 61 N. Y., 145; *Vernol* v. *Vernol*, 63 id., 45.) The evidence as to plaintiffs' failure to rescind after knowledge of the fraud was properly put in under the answer, which denied that plaintiffs suffered any damage under the contract. (*Benedict* v. *Seymour*, 6 How. Pr., 298; Moak's V. S. Pld'gs, 507 [m. p., 401]; *Dunlop* v. *Snyder*, 17 Barb., 561; *Ditchett* v. *R. R. Co.*, 3 N. Y. W'kly Dig., 506; *Nellis* v. *Central R. R. Co.*, 30 N. Y., 505, 513; 63 id., 244.) Fraud, whereby a party is induced to enter into an executory contract for the hiring of work, is not actionable when the party defrauded before performance and after knowledge of the fraud voluntarily ratifies and performs it, and also requires performance. (*Selway* v. *Fogg*, 5 M. & W., 83; *S. & S. R. R. Co.* v. *Rowe*, 24 Wend., 24; *Vernol* v. *Vernol*, 63 N. Y., 45; 17 J. R., 357; 19 id., 513; *Ilion B'k* v. *Carver*, 31 Barb., 230; *Lloyd* v. *Brewster*, 4 Paige, 537; *Swetman* v. *Prince*, 26 N. Y., 227; *Bronson* v. *Wiman*, 10 Barb., 406; *Harris* v. *Ins. Co.*, 3 Hun, 724; *Frost* v. *S. M. Ins. Co.*, 5 Den., 154; *Reed* v. *Randall*, 29 N. Y., 358; *G. M. Co.* v. *Allen*, 53 id., 515; *G.* v. *A. & G. W. R. Co.*, 58 id., 358; *Osborn* v. *Ganty*, 60 id., 540; 10 id., 178; 53 id., 114; *Joslyn* v. *Cowee*, 52 id., 90; 2 Hill, 451; *Delafield* v. *Illinois*, id., 175; 24 Wend., 431; 26 id., 192; 4 Paige, 537; *Clark* v. *White*, 12 Pet., 178; Sedg. on Dam., 28, 29, 103; 7 Hill, 104; 1 C. & P., 181; 2 Starkie's Ev., 741; *Lake* v. *Dawson*, 17 Pick., 284; *Thomson* v. *Shattuck*, 2 Metc., 615; 21 Wend., 457; 2 Den., 609; 1 id., 317.) An action does not lie to recover back moneys voluntarily paid, unless their payment was induced by fraud or mistake. (12 N. Y., 308; 1 Wend., 355; 2 Den., 26; 9 Cow., 674; 3 Barb., 370.) The adjudication in the action by the State against Stephens & Gale was a bar to any further action for the same cause. (*Zabriskie* v. *Smith*, 13 N. Y., 357; *More* v. *McCullock*, 5 Hill, 131; *Jackson* v. *Griswold*, 4 id., 522; *Burgess* v. *Simonson*, 45 N. Y., 225; 2 id., 269; *Bonchard* v. *Diase*, 3 Den., 238; *Krekeller* v. *Ritter*, 62 N. Y., 372; *Briggs* v. *Bowen*, 60 id.,

456; *People* v. *Stephens*, 52 id., 306; *Dwight* v. *St. John*, 25 id., 203; *In re Livingston*, 34 id., 555; *Kelsey* v. *Wood*, 38 id., 83; 4 id., 315; 14 Abb., 56; *House* v. *Mullen*, 25 Wal., 42; *McMaster* v. *Vernon*, 3 Duer, 24; 91 id., 633; 18 J. R., 459; *Green* v *Clark*, 12 N. Y., 343; *Kent* v. *H. R. R. R. Co.*, 22 Barb., 278; *Monroe* v. *Delevan*, 26 id., 19; *Kinnersley* v. *Orpe*, 2 Doug., 499; 42 Barb., 591; 5 Wend., 47; 5 Paige, 299, 303, 304; 5 Den., 220, 225; 2 J. R., 181, 191; 3 Den., 269; 4 Abb., 59; 16 id., 269; 4 Bosw., 638.)

RAPALLO, J.   These cases received very careful consideration at the Circuit; and, on granting the motion for a non-suit in the case of Stephens, an elaborate opinion was delivered by WESTBROOK, J., covering the numerous points which have been discussed on the present appeal. (51 How. Pr., 235.)   His decision was followed by OSBORNE, J., who delivered a similar opinion in the succeeding case of *The People* v. *Leahy et al.*, involving substantially the same points; and, in both cases, the conclusions reached at the Circuit were affirmed by the General Term of the third department.   I do not deem it necessary now to go over the same ground which is covered by those opinions.   Concurring in the result arrived at by the two learned judges before whom the actions were tried, and by the court at General Term, it is sufficient to state the point which this court deems controlling in both cases, without going into the other numerous questions which have been argued.

The bids or proposals in question in these actions were put in, and the contracts awarded and signed, in the last days of December, 1866.   The grounds of these actions are, that those bids were put in pursuant to an illegal combination between a number of canal contractors, entered into on the 28th of December, 1866, for the purpose of preventing competition between themselves, the result of which was that the State was induced to contract for the work at higher prices than those for which they might have contracted, had there been fair competition; also, in the case of Lord, that bids

were put in which apparently were *bona fide*, and competing bids, but which were not so in fact, and had been mutilated so as not to conform to the regulations, and with the intent that they should be rejected for that cause. And it is charged that the acts of the contractors to whom the contracts were awarded amounted to a false representation that the bids put in by them were *bona fide* bids, whereby the Contracting Board was deceived into letting the contracts to them at excessive prices.

The damages sought to be recovered are the difference between the sums paid to the contractors or their assigns for the work done under these contracts, and the actual value of the work, or the amounts which the State would have been obliged to pay for the same work had their been a fair competition, and the Contracting Board had not been deceived, as alleged, into making the contracts in controversy.

The main point upon which the defense rests is, that notwithstanding any fraud or illegal conduct, which may have led to the letting of these contracts, the State, after the discovery of the fraud, and while the contracts continued executory in whole or in part, elected to affirm them, and proceed with their performance. That it required performance by the contractors, that they performed the work, and the State regularly paid them the prices stipulated by the contracts, and by legislative action waived all questions relating to the origin of the contracts, except so far as to reserve the right, through certain officers, to annul such of the contracts as were not advantageous to the State, declaring at the same time as to such of them as might be annulled, that the contractors should nevertheless be paid all they had earned under the contracts up to the time of their annulment. If such was the policy of the Legislature, we are clearly of opinion that it is not the province of the courts to overrule it. In the case of a claim made by the Attorney-General on behalf of the State against a citizen, it is not necessary to the defense to show a technical release. It is sufficient to show that the Legislature has, in some form, expressed an

intention that the claim shall not be prosecuted. No one can successfully dispute that if an act had been passed declaring in terms that the Legislature, after being informed of all the circumstances relating to the origin of these contracts, was content that the State should abide by them, and that it waived all questions as to the means by which they had been procured, and directed that the contractors should be paid the full contract-price for all work done under them, such an act would be a complete bar to these actions. It only remains to be seen whether such is the effect of the legislative action in the present case.

In construing acts of the Legislature, the language of the act, and such historical or other facts as are within the scope of judicial cognizance, are ordinarily the only guides, and particular facts or special information placed before the Legislature cannot be resorted to. But, I apprehend, that when the State comes into court as a party in a controversy with an individual, the intent of the Legislature in any action it may have taken in respect to that controversy, may be ascertained in the same manner as in a controversy between individuals, where instruments executed by either party are to be construed in the light of surrounding circumstances.

The evidence discloses that the illegal combination of contractors, in respect to the bids which were put in on the 28th day of December, 1866, became public within a few days thereafter, and that early in the session of the Legislature of 1867 it became the subject of a discussion in that body, which led to the adoption of resolutions by the Senate on the 31st day of January, concurred in by the Assembly on the 6th day of February, 1867, directing an inquiry, and appointing a joint committee to investigate matters connected with the canals. That the frauds now complained of were included in the intended investigation, is shown, not only by the evidence of what occurred at the time of the adoption of the resolutions, but by the report of the committee, which was presented to the succeeding Legislature (of 1868) at its

opening, January 1, 1868, and sets forth in detail the identical frauds which are alleged in the complaints in these actions. It cannot be questioned, therefore, that as early as the beginning of 1868 the Legislature had official knowledge of all these frauds.

At the session of 1868, an act was passed authorizing the Attorney-General to bring actions to set aside contracts made in pursuance of the bids now in question, and to recover moneys paid by the State under such contracts, in excess of the fair value of the work and materials, in case it should be established that the contracts were procured fraudulently.

Under this act one action was brought by the Attorney-General, in November, 1868, against the defendants Stephens & Gale, which action was pending when the act of 1870 was passed. In the meantime, the contractors had proceeded with the performance of their contracts, with the assent of the officers of the State in charge of the canals, and had been regularly paid for their work at the times and prices fixed by the contracts, and in the Stephens' case, by joint resolution of the Senate and Assembly, passed in March and April, 1867, the commissioner in charge of the eastern division of the Erie canal was directed to require the contractor to proceed with his work according to the terms of the contract.

On the 10th of March, 1870, an act was passed (Laws of 1870, chapter 55, section 3), by which the Canal Board was authorized, upon the recommendation of the Canal Commissioners, whenever they should deem it to the interest of the State, to cancel and annul any contract or contracts for repairs of the canals theretofore made, by a resolution to be entered on the minutes of the said board; and section 4 of the same act provided that every contractor whose contract should be canceled and annulled by the Canal Board, should be entitled to receive the money deposited as security for the performance of his contract, with the accumulated interest thereon, together with the money earned under such contract up to the time of the annulling thereof, and a fair compen-

sation for the tools, materials and implements necessarily pro-
cured for the purpose of performing such contract. This
act, it must be observed, was passed with full knowledge on
the part of the Legislature of the means by which the con-
tracts had been obtained, and in view of the controversy
then existing in respect to such contracts; but the Legisla-
ture must have taken into consideration that, notwithstand-
ing its knowledge of the illegal combination which had led
to the awarding of the contracts, the State had required the
contractors to proceed with the work, had accepted it and
had gone on paying the contractors therefor, according to
the terms of the contracts, and it must be assumed from the
tenor of the act, that the Legislature did not deem it to the
interest of the State to avail itself of the right to set up
these frauds in all cases, and break up the contracts, nor to
refuse payment for the work already done under those which
it might elect to disaffirm. The act left it to the discretion
of the Canal Commissioners and Canal Board to determine
which of the contracts should be stopped, and substituted
this discretion in place of the authority previously given to
the Attorney-General to institute legal proceedings, and pro-
vided that even in those cases where the contracts should be
annulled, payment should be made for the work so far as it
had progressed, and for the implements and materials neces-
sarily provided by the contractors. It is not sensible to sup-
pose that there was any intention on the part of the Legis-
ture in directing these payments to be made, to reserve the
right to recover back any part of them, or of the previous
payments, on the ground that the prices were excessive, and
that the contracting board had been induced by fraud to
to agree to them. Still less reasonable it is to suppose
that they intended to reserve those rights as to the contracts
which they should elect to proceed with to their completion.
If it had been the intention to reopen the question of prices,
the act would have provided as did that of 1868, that the
contractors whose contracts should be annulled, should be
paid the value of their work and materials without reference

to the contracts. Instead of so providing, it directed the payment of the sums earned under the contracts, thus distinctly affirming them, and electing to abide by them so far as they had been performed, and providing for the termination of those which it was not to the interest of the State to continue.

We cannot escape the conviction that this act was intended as a final disposition of the whole matter, which had been so long agitated and discussed in the Legislature and elsewhere. The soundness or equity of the policy of the Legislature in making the disposition which they did, is not a proper subject for our consideration. If we are satisfied that it was their intention to terminate the controversy, we should not lend our aid to its revival. The State, by omitting to proceed under the act of 1870, to terminate the contracts now under consideration, and by going on and accepting the work and making the stipulated payments as they accrued, clearly manifested that it did not deem those contracts injurious to its interests, and that it elected to proceed with and abide by them, notwithstanding any objections they might have insisted upon as to the legality of their origin. Without discussing the effect of such action, under the general principles of law which would govern a similar case arising between individuals, we are of opinion that it was the intention of the Legislature to waive all questions as to the origin of the contracts which the officers vested with the discretion should thus elect to continue, as well as those which they should elect to terminate, and that that intention must be respected by the courts. The Legislature has the power to relinquish a claim of the State, or to waive its remedies for a fraud. If it chooses to do so, we cannot overrule its action, whatever opinion we may entertain of its propriety. The power and responsibility rests with it. But even were the controversy between individuals, it cannot be seriously claimed that payments voluntarily made with full knowledge of the facts could be recovered back in any form of action.

The case of *Whitney* v. *Allaire*, (4 Denio, 554); *S. C.* affi'd,

(1 Com., 305), upon which so much reliance has been placed by the appellants, does not sustain any such doctrine. All that it holds is, that where a lessor falsely and fraudulently represents that the premises described in his contract embrace lands which they do not in fact embrace, the lessee, by taking possession of the premises actually embraced in the lease, does not preclude himself from claiming from his landlord compensation for the lands which are deficient, or what he reasonably pays to hire them.

The action of the *People* v. *Stephens & Gale*, brought by the Attorney-General in November, 1868, under the act of that year, was brought to a hearing on demurrer, and decided adversely to the people in June, 1870, after the passage of the act of 1870, and the Attorney-General waived any appeal. (52 N. Y., 306.) After the termination of that action the work under the present contracts continued, and the payments thereon were regularly made by the State until their completion in 1872, and no question was raised in behalf of the State until after the completion of the contracts, when the controversy was revived by an unsuccessful attempt to appeal in the Stephens case, and by the bringing of these actions in 1873. We think that for the reasons already stated the actions cannot be maintained, and that the judgments appealed from should be affirmed, with costs.

ALLEN, J. I concur in the opinion of Judge RAPALLO, and agree with him that the legal effect of the act of 1870 (Laws 1870, chap. 55), was to validate the canal lettings of 1866, and ratify the contracts then made, subject to the power then for the first time conferred upon the Canal Board, but only to be exercised upon the recommendation of the Canal Commissioners to cancel or annul any contract or contracts for repairs whenever they should deem it for the interests of the State. The Legislature had the right and the power to arrest the performance of any and every of the repair contracts then in force, and annul them, and the act recognizes the existence of that power by delegating to a

subordinate body discretionary authority to annul them. The right of the Legislature to authorize the canceling and annulling of contracts, as provided by section three of the act quoted, has never been questioned, and was expressly reserved in the contract; and that which they might constitutionally do by the agency of the Canal Commissioners and the Canal Board, as to some of the contracts, they could do directly as to all. The act of 1868, hereafter referred to, recognized the right to rescind the contract for fraud, by giving the Attorney-General power to bring an action for that purpose. But, with full knowledge of all the vices of the contracts entered into in December, 1866, including that of the defendants in this action, and all the frauds with which they were tainted in their inception, they recognized their validity, directed their enforced performance, subject only to the right of the contractors to surrender them, and the power conferred upon the State officers to annul such as were not, in their judgment, for the interests of the State. The intent of the Legislature in this act is very patent. The prominent and primary object of the act was to abolish the contracting board and abrogate the system of repairing the canals by contract, both having lost favor with the people. The secondary object, and a mere incident of the main purpose, was to make definite provision in respect to pending and unperformed contracts, those *in fieri*. It was evidently not deemed wise to annul all such contracts; but, having the interests of the State in view, the Legislature declared that the act should not invalidate the contracts theretofore made, discharge the contractors from their duties and obligations, or impair the right of the contractors to their compensation or other relief under their contracts. But as the illegal acts alleged against the contractors or other causes might have led to lettings under some of the contracts at excessive prices, or on terms disadvantageous to the State, authority was conferred upon the Canal Board upon the recommendation of the Canal commissioners to annul such as they should find and adjudge to be of that character. The Canal Board could not

of their own motion annul any contract, but the proceedings for that purpose were to be initiated by the Canal Commissioners. This was in harmony with the views of eminent statesmen, friends of the canals, that the Canal Commissioners, and the other officers chosen with express reference to their peculiar fitness for the administration of the canals, should not be embarrassed by the officious interference of the State officers chosen for other duties, but who were members of the Canal Board. The contracting board composed of the Canal Commissioners, State Engineer and Surveyor, and Auditor of the Canal Department, grew out of this desire to withdraw the administration of the canals, so far as practicable, from the Canal Board, composed in part of the officers at the head of the different State departments. The Legislature did not undertake to adjudicate upon the individual contracts, but devolved the duty upon the Canal Commissioners to determine which, if any, were for reasonable prices and favorable to the State, and which, if any, were for excessive prices, and not for the interests of the State, and authorized the Canal Board in its discretion to annul such as the commissioners should recommend to be annulled as not for the interests of the State.

The Leahy contract was not annulled, and the commissioners by not recommending its cancellation necessarily adjudged that it was for the interest of the State that it should be performed, and in this determination they represented the State under the special power conferred by statute, and by their acts the State is bound, and this was the intent of the statute. The object of the provision, and the purpose of the Legislature was to determine and put an end to all contracts tainted with fraud, from which damage had ensued to the State — that is, all contracts that had been entered into under the influence of the combinations between the contractors at excessive prices, or on terms disadvantageous to the State, and to affirm and ratify all others. The policy was wise; but whether wise or not, it was apparently in the interest of the State, and courts cannot now sit in review

of the action of the officials to whom the Legislature delegated the power to pass upon and determine every question that could affect the relation between the State and the contractors under those contracts. In acting under this contract the commissioners dealt anew with the contractors, and their acts ratifying a contract must be final unless impeached for fraud. To give the act a different or less potential effect would be to make it a snare and a trap. The Legislature acting by the commissioners have adjudged, in substance, that the contracts not annulled are for a just and reasonable compensation, and that the State will suffer no loss by their performance, and the contractor has been·suffered and enjoined to perform his contract, and has received the agreed compensation, instead of availing himself as he might, if the validity and fairness of the contract was still an open question of the privileges of the statute, and surrendered his contract, and received his stipulated compensation under the contract up to the time of the surrender.

It was neither the effect nor intent of the statute thus interpreted to pardon or whitewash any fraud, but merely to re-examine the lettings with full knowledge of the fraudulent acts alleged, and affirm such contracts, and such only, as were not disadvantageous to the State, notwithstanding the combination and the restricted or sham bidding. We should necessarily look in vain, to the newspapers of the day, or the cursorily and sparsely published debates, for any very intelligent aid in interpreting the act or discovering the intent of all its provisions. A more certain and safe resort is to the statute itself, read in all its scope and construed in the light of the surrounding circumstances, and the occasion of its passage. Every part of the act indicates the purpose of the Legislature finally to dispose of every disputed question, and either annul or affirm the contracts. By section two of the act, the contractor has the absolute right, irrespective of fraud, actual or alleged, to surrender his contract, and upon such surrender the contract was annulled, and the contractor, by sections four, five, was entitled to full compensation, according

to the terms of his contract, up to the time of the surrender, as well for the ordinary repairs as for permanent improvements, and a full and fair compensation for the tools, materials, etc., necessarily procured by him. This surrender could be made at any time before the expiration of the contract, and the law was mandatory upon the Canal Board to accept the surrender and make the settlement on the terms stated, and without abatement. No one would claim that after a settlement and payment under this provision an action for damages would lie upon an allegation that the amounts paid were excessive. A like settlement was to be made, and on the same terms, upon the annulling of a contract by the Canal Board under section three of the act. A cancellation and settlement, by the accord and agreement of the parties, or by the enforced action of the State, would necessarily operate as an accord and satisfaction of every claim, under or in respect of the contract and payments made in pursuance of it. It is absurd to suppose that the like result was not intended to follow the performance of the contract during the whole term with the assent of the State, and with the approbation of its officers having the power to annul it if not advantageous to the State. But my brother Rapallo has fully considered this branch of the case, and my only purpose and intent was to make brief reference to one or two other topics involved in the action and incidentally discussed.

Arrangements and combinations among those prepared and expecting to become bidders at auctions to prevent competition, and bring about a sale at a price below the fair market value of the article sold, are condemned as immoral and against public policy, and tending to defraud the seller and all interested in the sale. Arrangements and agreements of this character will not be enforced between the bargainers, as directly opposed to the policy of encouraging bids, especially at public judicial sales, and tending to defraud the creditor at whose instance the sale is had, as well as the debtor whose property is sold. The same principle is applied

to the like bargains and arrangements to prevent competition at any sale by public auction and for similar reasons. Neither will courts permit judicial sales to be consummated, nor enforce sales made as between private individuals by auction, when by reason of such arrangements or combinations bidding has been prevented or property has been struck off at a price below its actual value, and the sum which it would or might have brought but for such illegal interference with the bidding. The general rule is, that a purchaser at auction who uses unfair means to prevent competition cannot hold the property. These general principles are not questioned, and are uniformly sustained by the courts. (*Newman* v. *Meek*, 1 Freeman's Chy., 441; Babbington on Auctions, 53; *Jones* v. *Caswell*, 3 J. Ch., 39; *Benedict* v. *Gilman*, 4 Paige, 58; *Brown* v. *Lynch*, 1 id., 147.)

Agreements between two or more persons, that all but one shall refrain from bidding, and permit that one to become the purchaser, are not, however, necessarily and under all circumstances vicious. They may be entered into for a lawful purpose and from honest motives, and in such cases may be upheld, and will not vitiate the purchase. (*Dick* v. *Cooper*, 24 Penn., 217; *Galton* v. *Emuss*, 1 Collyer, 243, and cases in note; *In re Carews' Estate*, 26 Beavan, 187; *Phippen* v. *Stickney*, 3 Metc., 384.) Neither do they necessarily, and under all circumstances, vitiate the completed contracts to which they refer, and in respect to which they are made. (*Jones* v. *North*, L. R., 19 Eq. Cas., 426; Kerr on Frauds, 224.) The general rules condemning as unlawful combinations to prevent bidding at auction sales, have with good reason been applied to offers to the government of services or property in response to a call for proposals, with a view to contract with the lowest bidder — that is, when the bidding is after what, *Gulick* v. *Ward*, *infra*, called a "Dutch auction," a bidding downwards. (*Gulick* v. *Ward*, 5 Halst., 87; *Woodworth* v. *Bennett*, 43 N. Y., 273.) The bargain and combination of the contractors immediately preceding the lettings to Leahy and others, and by which the privilege

of bidding for the work upon a particular contract secured sections to one individual without competition, were against public policy and illegal, and if they resulted in a letting at unreasonable prices, authorized a rejection of the proposal and a repudiation of the contract, and there was some evidence for the jury of the participation of the defendant Lord in that combination. Its sufficiency would have been for the jury, had the trial not been arrested by a nonsuit. The contract was also assailed as fraudulent by reason of the acts of the parties in submitting, or causing to be submitted, to the contracting board sham and false proposals holding them out as genuine. In this particular instance, the simulated offers were at higher prices than those named in the proposal of Leahy, and the latter was in fact the lowest bidder. Whether the other bids affected the judgment of the contracting board, and influenced its decision in accepting the proposal, on the ground that it was not excessive in price or disadvantageous to the State, there is no evidence.

The contracting board might, irrespective of the conditions of the published notice under which the proposals were made, have rejected the bid of Leahy, by reason of the combination and the consequent restricted bidding. But this right did not depend solely upon the established legal rules applicable to the case. The right which the law gave was expressly reserved in the call for proposals, to decline all proposals "in case the board shall be of opinion that the proposals are, in consequence of *any combination*, or otherwise, excessive or disadvantageous to the State," and by statute the duty was imposed upon the contracting board to reject all proposals upon the same conditions, and in the same language. (Laws of 1854, ch. 329, § 10; id., 1867, ch. 577, § 7.) The views of the contracting board and of the Legislature evidently were, that if offers at fair prices and in terms not disadvantageous to the State were received, the object of the competitive bidding was secured, and any combination was innocuous and immaterial. The contracting board did, upon objection being made by one of its

members, expressly adjudge that the proposal of Leahy was not excessive in price or disadvantageous to the State, and upon that determination accepted the bid and entered into the contract. Evidence was given on the trial tending to show that the contract-price was excessive; but there was no evidence that the contracting board acted corruptly or *mala fide*, or that they had not full knowledge of every fact bearing upon the question, as well as of the character and value of the services to be performed, and the risks to be encountered by the contractor. The contracting board alone had power to make the contract, and neither the Canal Board, nor any other board or body had power or responsibility in respect to it. After it was consummated, the duty of enforcing it and compelling its proper performance, was with the canal commissioner in charge of the division, and the monthly payments were made by the Auditor of the Canal Department on the drafts of the canal commissioner. The Canal Board were expressly prohibited from canceling or annulling any contract entered into pursuant to law for the repairs of the canal. (Laws of 1859, chap. 495.) There was no authority vested in express terms by law, for the annulling or disaffirming any contract in any official or body of officials, except in the contracting board, for the causes specified in section 3 of chapter 105 of the Laws of 1857; and a fraudulent inception of the contract is not one of the causes for disaffirmance mentioned in the law, but general powers were conferred on the Canal Commisoners in respect of the canals. Laws did exist prior to the act of 1870, and from 1849 permitting contractors to surrender their contracts, and receive their agreed compensation up to the time of the surrender. (Laws of 1849, chap. 348; id., 1859, chap. 495; id., 1864, chap. 252.) The Legislature in the exercise of its legitimate authority, and representing the sovereign authority of the State, had full power to take action in the premises, and by the action of that body the State is necessarily bound; and if by its acts, performed with full knowledge of the alleged fraud, and all the vices and

infirmities of the contract, it affirmed and ratified the contract, and consented to its performance, disregarding the fraud it is too late after the full performance of the contract by both parties upon a change of inclination by the State authorities to retreat, and make claim to damages upon the ground of fraud clearly abandoned. The Legislature, as early as January, 1867, less than one month from the time the contracts went into effect, had notice that fraud and malpractices were suspected and alleged, and ordered an investigation by a joint committee of the Senate and Assembly. A report was made on the first of January, 1868, to the Senate by the Senators, members of that committee, clearly exposing every evil practice now either alleged or proved which could effect the honesty or validity of those contracts, and action was taken upon it by authorizing the Attorney-General in his discretion to bring suits to annul them or any of them. (Laws of 1868, chap. 869.) That the right to rescind them existed, is clearly recognized by the terms of the act. From that time the assignee of the contract of Leahy was suffered to perform the contract without let or hindrance from the State or State agents, and received his compensation monthly according to the terms of his contract, the Legislature making annual appropriations therefor as a part of the annual budget sent in by the Auditor of the Canal Department, and the annual reports of the Canal Commissioners, and acted upon by the Legislature in making appropriations for the support and maintenance of the canals. By this action the validity of the contract, and the right of the contractor to compensation, were clearly recognized and affirmed. The contract was ratified by the State officials, and the right to object to the alleged fraud waived. The State, in all its contracts and dealings with individuals, must be adjudged and abide by the rules which govern in determining the rights of private citizens contracting and dealing with each other. There is not one law for the sovereign and another for the subject; but, when the sovereign engages in business and the conduct of business

enterprises, and contracts with individuals, although an action may not lie against the sovereign for a breach of the contract, whenever the contract, in any form, comes before the courts, the rights and obligations of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons. Both stand upon equality before the law, and the sovereign is merged in the dealer, contractor and suitor. The State is not, in tutelage, as one incapable of acting *sui juris*, but has capacity to act in all matters by its representatives and agents, and is bound by the acts and admissions of its duly appointed and recognized officers and representatives, acting within the general scope of their constitutional powers, whether ministerial or executive. In the absence of fraud or collusion, the acts of public officers, within the limits of the authority conferred upon them, and in the performance of the duties assigned them in dealing with third persons, are the acts of the State, and cannot be repudiated. Neither can the State allege infancy, incompetency or disability to avoid the effects of the official acts of its agents. This is of necessity; for, as the State can only act by its duly constituted authorities, there would be no safety in dealing with the State, if it were otherwise, and each succeeding official could repudiate the acts, avoid the contracts, rescind settlements, and reclaim payments made by his predecessor. The Legislature may and does regulate the power of its officers, and the power can only be exercised within the prescribed limits, but the Legislature does not negotiate contracts. Its powers are legislative, and every other power is delegated to other branches of the government.

In the administration of the canals at the time of the making of this contract, and during its performance, there were three distinct boards or bodies of officials having some connection with the canals. The Canal Board, with limited powers, and having no power to make, annul, or control or direct the making or annulling of contracts for the repair of the canals, or in respect of the performance of such contracts. The contracting board, with power to make contracts

for such repairs, and to declare them abandoned for certain specified causes (Laws of 1857, chap. 105, § 3), and the Canal Commissioners, in whom "the general care and superintendence of the canals is vested." (1 R. S., 219, § 9.) The acts of the contracting board and the Canal Commissioners, within their respective spheres of duty, were the acts of the State, obligatory upon it. They were charged with the interests of the State, and individuals contracting, dealing, or settling with the State in matters within their official cognizance, could look nowhere else for an authorized representative of the State, and were compelled to deal with those bodies. The Canal Commissioners could take any action, except as expressly or impliedly forbidden by law, in the general care and superintendence of the canals, which was expedient or proper for the due performance of the very comprehensive duties imposed upon them. This would include the arrest and prevention of any work at unreasonable and extravagant prices, and the performance of contracts procured by fraud and prejudicial to the interests of the State. It would be preposterous to say that with these officers created, and these boards in existence, with their very general and comprehensive powers, the Legislature had not fully provided officers and agents competent for the protection of the State against fraud and ruinous extravagance in prices. In ratification and affirmance of the contract, we have first the judgment and determination of the contracting board, accepting the proposals and making the contract, whose province it was to determine whether the proposals were for just and reasonable prices, and for the interest of the State, and to decline all such as were not of that character. Secondly. The omission of the Legislature of 1868, having full knowledge of the alleged combination, to repudiate the contracts, and the consent of that body to their performance unless rescinded by the action of the Attorney-General, followed by annual appropriations for payment of the contractors. Thirdly. The implied admission of the Attorney-General, his direct approval of the contract under

the discretionary power given him, and by which he was made the agent of the State *pro hoc vice* to commence a suit to have the contract declared fraudulent and void, he, in his discretion, omitting to bring the action. Fourthly. The report of the contracting board to the Attorney-General, signed by three Canal Commissioners in October, 1867, that the contracts of December, 1866, including that before us, were not excessive in price or disadvantageous to the State, and this after they had full knowledge of the alleged combination. And, Fifthly. The action of the Legislature in 1870, and the State officials under the same. In effect we have the approval of this contract, and an affirmance thereof by the Legislature, and every official connected with its performance.

But the position is taken that the contract having been in part performed before the discovery of the fraud, and the State not being able to restore the contractors to the position, in all respects, in which they were before entering upon the contract, it could not rescind it, but must suffer the performance to be completed, and rely for relief and indemnity for the fraud and damage upon an action, after all the damages had been sustained, by the payment for the whole five years of the excessive prices obtained, as alleged by means of the fraud. In other words, the contention is, that if A. is fraudulently inveigled into a contract with B. for the purchase of fifty horses, ten to be delivered each month at a fixed price for each horse, payment to be made at each monthly delivery for those delivered, and accepts and pays for the first ten without notice of the fraud, he must, although he discovers the fraud before the time for the delivery of the next installment, receive and pay for them, unless he has in possession all of the first ten to return to the vendor, and resort to an action to recover damages for the fraud. Or if one engages another, upon false and fraudulent representations, to serve him for a specified time, the wages to be paid in equal proportions each week, and the servant performs and is paid for one week's service before the fraud is discovered,

the employer cannot discharge him and terminate the employment because he has had the benefit of the one week's service which he cannot restore.

This is claimed under the principles applicable to the rescission of contracts. There is no dispute about the doctrine referred to, and can be none under the authorities or upon sound reason. The general rule is, that the party who would rescind a contract on the ground of fraud, for the purpose of recovering what he has advanced upon it, must restore the other party to the condition in which he stood before the contract was made, except when the party who has practiced the fraud has entangled and complicated the subject of the contract in such a manner as to render it impossible that he should be restored to his former condition; and in that case the party injured upon restoring, or offering to restore, what he has received, and doing whatever is in his power to undo what has been done in the execution of the contract, may rescind and recover what he has advanced. And within this rule it would seem that the State might, on the discovery of the fraud here, have sought a rescission by action, as was authorized by the act of 1868. It is also well understood, that if fraud is not discovered until after a contract entire has been partly or wholly performed, and the defrauded party has parted with his property or money, he need not rescind, but may affirm the contract and bring an action for his damages. These general principles are so well settled, that it is scarcely permissible to quote authorities. A few of them are referred to in the briefs of the appellants' counsel.

The case chiefly relied upon to sustain the appeal upon this branch of the case is *Whitney* v. *Allaire*, several times before the courts, and reported in 1 Hill, 484; 4 Den., 554; and 1 Comst'k, 305. That case has a very remote, if any, bearing upon the question now under consideration. That was an action for rent upon a demise of certain premises in New York, made in February, 1837, for a term to commence on the first day of May thereafter. As an induce-

ment to the hiring, the lessor represented that the premises comprehended a parcel of land which, as it afterwards turned out, belonged to the city corporation. The lessee discovered the fact before the first of May, and obtained a lease from the city of the parcel owned by the corporation, and took possession of the whole on the first of May and occupied for the term. The lessee claimed, and was permitted to recoupe for the damages sustained by reason of the want of title to the parcel owned by the corporation, or in the language of the syllabus to the case, as reported in 1 Hill: "Held, in an action by W. (the lessor) for the rent, that A. (the lessee) was entitled to a deduction by reason of the fraud, of at least what he was in good faith obliged to pay for the corporation lease." It was held that, by the demise for a term commencing *in futuro*, a present interest passed to the lessee, and so the contract was an executed contract, subject only to the conditions subsequent of the payment of the rent and the performance of the other covenants by the lessee. It is true the judges said that the result would have been the same if the contract had been executory. As a contract executed before the discovery of the fraud, there was no doubt of the right of the defrauded party to retain the property and recover damages for the fraud, and as the consideration for the demise had not been paid, it was a plain case for recoupment. It is well settled that a party is not bound to return the property he has been induced by fraud to purchase, but may retain it and take his remedy by action for the fraud. But it by no means follows, either logically or legally, that one who has made an executory contract for property to be delivered and paid for in the future, and discovers that he has been cheated, can without objection or protest receive the property and pay for it, and then sue for the fraud. The fraud in such case is consummated, and legal damages incurred only by the acceptance of the property and paying for it. The parting with the consideration constitutes the legal damage, and that being done with full knowledge of the cheat, fraud

or deception cannot be alleged. But assuming that the contract of letting in the Allaire case was executory, and was consummated and executed only on the first of May, when the lessee took possession of the premises, it was a very clear case for recoupment and compensation for the loss of the parcel of land to which the lessor had no title. Whatever the lessee could have compelled in equity, he might have accepted without action without imperiling his legal or equitable rights. Under the circumstances, had the contract been for a lease to be executed on the first day of May, he could have compelled the lessor to make a lease for the premises to which he had title, and to make compensation by deduction from the rent to that parcel to which he had no title. This is the well-established rule in equity. When a vendor or lessor cannot make a complete title to all the property sold or leased, as it would be unjust to allow the vendor or lessor to take advantage of his own wrong or default, the purchaser or lessee has an election to proceed with the purchase or lease *pro tanto*, or to abandon it altogether; and if he exacts performance he may have an abatement from the purchase money or deduction from the rent by way of compensation for the deficiency in the title. (*Paton* v. *Rogers,* 1 V. & B. 351; *Waters* v. *Travis,* 9 J. R., 465; *Graham* v. *Oliver*, 3 Beav., 124; *King* v. *Wilson*, 6 Beav., 124; *Morss* v. *Elmendorf*, 11 Paige, 277; *Voorhees* v. *De Meyer,* 2 Barb., 37; affirming 3 Sandf. Ch. R., 614.) That was precisely what Allaire did; he accepted and occupied, under his lease from Whitney, so much of the premises as Whitney could demise, and the court held him entitled to compensation for the loss of that part which Whitney did not own. The analogy between the case cited, and so much relied upon by the appellants, and that before us, is certainly very remote, if there is, indeed, any. It cannot serve as a precedent, and is not an authority for determining any question presented by this appeal. It is true that the discussion took a wide range on the different occasions when the case was before the courts, and expressions of the learned judges may

be found having a seeming bearing, at least, upon some of the questions under consideration here. But the case only presented the points before suggested, and involved no other principles, and the remarks of the learned judges should be construed in reference to the case in which they were made, and not extended to cases and a state of facts not in their minds. *Thorn* v. *Helmer* (4 Abb. Ct. of App. Dec., 408); *S. C.* (2 Keyes, 34), is entirely foreign to the case in hand. Upon the fraudulent representations of the defendant, the plaintiff had been induced to leave a good practice, and remove to this State, and form a partnership with the defendant in the practice of medicine. The fraud was not discovered until after his removal to New York and the consummation of the contract. At the end of a year, the terms of the copartnership were modified, and the court very properly held, and could not hold otherwise, that the plaintiff had not lost or waived his right of action for the original fraud. It is difficult to discover any bearing of the decision upon the present appeal.

*Mallory* v. *Leach*, (35 Vt., 156), was a case of fraud by which the plaintiff had been induced to sell shares of stock in an incorporated company to the defendant for less than their value. Before discovering the fraud, she had received the full consideration for the sale, and had transferred the stock, receiving part of the purchase-price in money and part in the promissory note of the purchaser. The only point decided was that the receipt of the money upon the note was not a waiver of her action upon the original fraud. The contract was a completed and executed contract on both sides, each having accepted the consideration moving from the other. The plaintiff clearly waived no right of action by retaining that which she had received, and was not bound to rescind the contract.

Without reviewing in detail the other cases recited by the appellant, it suffices to say that *Whitney* v. *Allaire* is chiefly relied upon as an authority, and can be cited only by reason of some of the remarks of the judges, not necessary

to the decision, and the others have little, if any, bearing upon the questions before us. They can only be cited for the appellants by giving them a strained and unwarranted construction.

The rule that an acceptance of property, under a contract of purchase, induced by fraud, and payment for the same with knowledge of the fraud, is a waiver of the fraud, and of all objections which might have been taken, founded thereon, is well settled. (*Sweetman* v. *Prince*, 26 N. Y., 232; *Reed* v. *Randall*, 29 id., 358; *Gurney* v. *At. and Gt. W. R. R. Co.*, 58 id., 364; *Selway* v. *Fogg*, 5 M. & W., 83; *Vernol* v. *Vernol*, 63 N. Y., 45.)

I do not understand that an action will lie upon the instant a fraud has been practiced and before the defrauded party has parted with value, or in any respect changed his situation by reason of the fraud. Fraud and damage must concur to give an action. If no damage ensues, it is *damnum absque injuria*, and no action lies. But that is not important in the view I take of the other questions in the case. It is very doubtful whether the doctrine invoked by the plaintiffs, that a contract cannot be rescinded so as to enable the party defrauded to recover that which he has parted with, unless he can in all things place the other party to the contract in the same position in which he was before entering into the contract, is applicable to a contract like the present. The principal thing contracted for was the five years' service in keeping a section of the State canals in repair. All the stipulations in the contract are incidental to this main purpose, and to carry it out, such as the purchase of the tools by the contractors, etc. The services were to be paid for by equal monthly installments, and upon the termination of the contract, at the end of any one month, from any cause, the contractor could only claim compensation for the services and expenditures to the end of the month, and according to the stipulation of the contract. The plaintiffs could, at any time, have terminated the contract, and refused longer to permit the defendants to perform the services contracted for. This

might not be strictly a rescission of the contract, so as to give a right of action for the money paid under it, and the plaintiffs would have been liable for any damages which the contractors would have sustained, and if the State could be sued, such an action would have been maintainable if the breach was without justifiable cause. In an action of that kind, if there were no legal defense to it, the recovery would not be the amount which the contractor would have received under the contract upon performance, but merely the damages which he had sustained — that is, the difference between the contract-price and the amount it would have cost him to perform the contract; in other words, the legitimate profits he would have made. (*Clark* v. *Marsiglia*, 1 Den., 317; *Lord* v. *Thomas*, 64 N. Y., 107.) But no recovery could be had in case the allegations of the plaintiffs are true, that the contract was fraudulent in its inception. It is an elementary principle that an action will not lie upon a contract tainted with fraud at the suit of him by whose fraud the contract is induced. The Legislature, therefore, could, on the full discovery of the alleged fraud in January, 1868, have repudiated the contract, and by so doing would have been under no legal or moral obligation to indemnify the contractors against loss, or to remunerate them for their contract. The State certainly would have been under no obligation to pay to the contractors the excessive price claimed to have been secured by the alleged fraud. It is conceded that this might have been done before the commencement of the work. (*Sar. & Schenec. R. R. Co.* v. *Row*, 24 Wend., 74; Evans' Pothier on Obligations, vol 1, p. 119, note *a*.) This being a contract for services payable monthly, there is no reason why it might not have been done at any time, as the State did, in fact, do by the act of 1870.

It follows that having the power and the right to repudiate and refuse to perform the contract after the commencement of performance, and without waiving liability for damages, if fraud existed as alleged, a continuance of the contract with knowledge of the fraud, and under circumstances entitling

the contractors to the prices stipulated by the contract (*S. & S. R. R. Co.* v. *Row, supra*), and voluntarily paying the stipulated compensation, was a waiver of the fraud. The payments were voluntary and with knowledge of the fraud, and within well-settled rules, cannot be recovered back; and in this action the damages would be measured by the amount paid in excess of the actual value of the work. *Volenti non fit injuria,* is a maxim peculiarily applicable to this case. The State agents acting within the scope of their authority, with full knowledge of the acts and combinations charged, and every fact affecting the validity of the contract, and with full knowledge of the character and value of the services and materials rendered and furnished, required of the defendants a performance of the contract, and at the end of each month paid the stipulated compensation without protest or objection, and without coercion or duress.

It is not claimed that the State officials were incompetent, unfaithful to their trusts, deceived or misled, or that they acted under a mistake of fact. The loss and damage to the State, if any, then, consisted in its payment of an excessive and unreasonable price for work under a contract voidable for fraud, and this action is to recover the sums paid in excess of the fair value. The fundamental principles of the law, embodied in the maxim quoted, that whatever a party assents to is not esteemed in law an injury, would forbid a recovery under such circumstances. The doctrine is, that when a party voluntarily pays money, with full knowledge of the facts, or when he pays it, intending to give up his rights, he cannot afterwards bring an action to recover the money back, and whether the action is for money had and received, or in some other form for the same relief, is immaterial. The rights of suitors are not varied by a change in the form of action. (*Remfrey* v. *Butler,* E. B. & E., 887, 897 [96 E. C. L. R.]; *Story* v. *Russell,* 1 E. & E., 905; *Barber* v. *Pott,* 4 H. & N., 759; *N. Y. and H. R. R. R. Co.* v. *Marsh,* 2 Kern, 308; *Clarke* v. *Dutcher,* 9 Cow., 674; *Mowatt* v. *Wright,* 1 W. R., 355; *Sup'rs of Onondaga* v.

*Briggs*, 2 Den., 26; *Mut. L. Ins. Co.* v. *Wager*, 27 Barb., 354.)

It may be suggested that the doctrine of *respondeat superior* does not apply to the State, and it may be conceded that the State is not responsible for the negligence or misfeasance of its servants, in cases where, within the ordinary rules of law, a master would be responsible for the acts of a servant. But when power is necessarily devolved upon a public officer to perform acts for the State, and third persons deal with such officer relying upon his authority and the validity of his acts, there is no reason or principle why the doctrine *qui facit per alium facit per se* should not apply to the extent of binding the State for contracts and payments made by the officer in the discharge of the duties of his office, and within the limits of his authority, and to the same extent that a principal would be bound by the acts of an agent under the same circumstances. It would not be permissible for a Comptroller or Auditor of the Canal Department, or other auditing officer to review the actions of his predecessor in the auditing and payment of claims, because he might think that a settlement as advantageous as might or ought to have been made had not in fact been made. Parties dealing with State officers may regard their action as a finality, and it would tend to serious consequences if every completed transaction of public officers might be submitted to a jury of twelve men in an action at law, brought at any time within six years after its consummation. There would be no safety in dealing with the State if such was the law, and the public would have to pay dearly in all contracts and settlements with individuals for this privilege of reviewing the action of their servants and agents. (Story on Agency, § 307 *a*; *People* v. *Jansen*, 7 J. R., 331; *Hayden* v. *Agent of State Prison*, 1 Sandf. Chy. R., 195; *Supervisors* v. *Briggs*, 2 Den., 26; *Martin* v. *Supervisors*, 29 N. Y., 645; *Chase* v. *Saratoga*, 33 Barb., 603; *Supervisors* v. *Birdsall*, 4 W. R., 453; *People* v. *Greene*, 56 N. Y., 466; *People* v. *Thayer*, 63 N. Y., 348; *United States* v. *Kirpatrick*, 9 Wheat., 720.)

To the extent that some of the cases have held that the government is liable for mere laches or neglect of a public officer they may not be authority, but there seems to be no dissent from the proposition that by acts of public officers within the scope of their powers, the public is bound. It is not difficult to denounce the acts of the contractors in harsh terms, and apply vituperative epithets, but although deserved they cannot vary the well established rules of law; and while it is easy, and the temptation may be great to yield to popular impulse, to do so, would not entitle the court to that respect which it should command, and would not tend to the stability or permanence of the law essential to the proper protection of individual rights, but would rather bring discredit on the court, and make its decisions as vacillating and uncertain as are the currents of popular favor and clamor.

The legal objections to the plaintiffs' right of action are insuperable, and the judgment must be affirmed.

All concur except EARL, J., who dissents and reads opinion, and CHURCH, Ch. J., not voting.

Judgment affirmed.