THE PEOPLE, ex rel. MERRIAM, *against* SCHOONMAKER.

The auditor of the canal department is not a mere ministerial officer. (*Laws of* 1848, 272, §§ 2, 11.)

He is not bound to draw his warrant for the payment of a draft made upon him by a canal commissioner, unless the latter is authorized by law to make the draft.

A canal commissioner is empowered to adjust the amount of damages caused by the appropriation of water for the temporary supply of the canals. (*Laws of* 1833, 261, §§ 1, 2 : 1 *R. S.*, 227, § 58.)

*239] *But he has no authority to do so, where the appropriation is for the permanent supply of the canals.

And where a canal commissioner adjusted the amount of damages caused by the diversion of water for the necessary supply of the canals, and drew and delivered to the claimant a draft on the auditor for the amount, and the latter declined to draw his warrant on the treasurer for its payment ; *Held*, that he could not be compelled by mandamus to do so, it appearing that the damages were occasioned by an appropriation of the waters for the permanent supply of the canals.

People *v.* Schoonmaker, 19 Barb. 657, reversed.

IN May, 1854, an alternative writ of mandamus was issued by the supreme court in the 4th district, directed to Marius Schoonmaker, auditor of the canal department of the State of New-York. It recited that during the years 1849 and 1850, John Post was the owner of a saw mill, situate on the Black river, below the state dam where the water is taken from the river for the Black river and Erie canals; that for the purpose of supplying the Erie canal with water, the canal commissioner in charge caused the waters of the river to be totally diverted from it and the mill of Post, through the feeder of the Black river and Erie canals during the period of sixty days in the year 1849, and forty-eight days in the year 1850 ; that thereby Post sustained damages to the amount of $648, and the canal commissioner in charge referred his claim for such damages to the division engineer in charge of this portion of the canals, who settled the claim at $648 and certified the same

to such canal commissioner; that thereupon the canal commissioner, on the 14th day of April, 1854, made his draft directed to the auditor of the canal department and requiring him to pay to the order of Post $648, the amount of damages mentioned in a receipt annexed. The draft was stated to have been drawn under chapter 650 of the Laws of 1853; annexed to it was a receipt signed by Post acknowledging the receipt by him of the draft from the canal commissioner, in full for damages sustained by the diversion of water from the Black river to the Erie canal, as per affidavits and account filed in the canal department. The *writ further recited that the draft was transferred [*240 to Merriam, the relator, who presented it with the receipt annexed to Schoonmaker, the auditor, for payment, and that the latter unjustly refused to pay the draft by drawing his warrant on the treasurer of the state for its amount; and commanded the auditor to pay the draft by drawing his warrant for its amount, or show cause, &c.

The auditor made a return to the writ, and alleged in justification of his refusal to pay the draft, that it was unauthorized by law, and that neither the canal commissioner or division engineer had authority to settle or adjust on behalf of the state the damages alleged to have been sustained by Post. For a further return the auditor stated the following facts: The Black river and Erie canal feeder and the works connected therewith, were constructed by the canal commissioners under and by virtue of chapter 157 of the laws of 1836. The summit level of the Black river canal is on the dividing ridge, between the Mohawk and Black rivers, and from the southerly end of such level the Black river canal descends to and connects with the Erie canal, and from the northerly end of the summit it descends to the valley of the Black river. That by virtue of § 1 of the act last above mentioned, the canal commissioners constructed a navigable feeder, from the Black river to the canal at Boonville, a distance of ten miles, with a capacity to pass 16,000 cubic feet of water per

minute, and which feeder is four feet deep, and was and is
designed for a permanent feeder to the Black river and Erie
canals.   The canal commissioners erected a permanent and
expensive dam across the Black river, for the purpose of
raising its waters sufficiently high to draw them into the .
feeder and pass them on to the summit level of the Black
river canal, and the surface of the water in the reservoir,
created by the dam, is in the ordinary stage of water only
one foot higher than the surface in the feeder.   The only
water relied upon for a permanent supply of the Black river
*241]   *canal, is the water of the river drawn through such
feeder, and the water of the river drawn through the
feeder, is to a certain extent also relied on for the permanent
supply of thirty-seven miles of the Erie canal and one of its
weigh locks.   Since the construction of the Black river canal
and the feeder, the waters of the river have in each year dur-
ing the season of navigation been used and appropriated for
and towards the permanent supply of the Black river and
Erie canals, and not for any temporary supply or purpose.
Such permanent use of the water created a scarcity for the
supply of the mill of Post, in the writ named, in the dryest
seasons of the years 1849 and 1850, by reason of the dimi-
nished quantity of water in the river, and not by reason of
any increased quantity of the water taken for any temporary
purpose or supply by the canal commissioners or either of
them ; and that the draft mentioned in the writ was made
for the damage arising from such scarcity thus occasioned.
The further return also averred that there was no law
authorizing either the canal commissioner or a division
engineer to settle for or adjust the damages in such a case.
and that the commissioner had no jurisdiction or authority
to make the draft.

The relator demurred to the return, and the defendant
joined.   The cause was heard at a special term, and judg-
ment rendered in favor of the relator, awarding a peremp-
tory writ against the defendant.   This judgment was
affirmed by the supreme court, sitting in the 3d district.

(*See* 19 *Barb.*, 657.) The defendant appealed to this court. The cause was submitted on printed briefs by

*John H. Reynolds*, for the appellant.

*H. D. Faulkner*, for the relator.

GARDINER, C. J. The demurrer was sustained and a peremptory mandamus awarded upon the grounds insisted *upon by the relator, first: That the powers of the [*242 auditor are strictly ministerial; that the draft being in the proper form, he had no discretion in the premises, but was bound to issue his warrant for its payment without the right to inquire as to the authority of the commissioner, or to act upon his own knowledge that that officer, in making the draft, had transcended his powers. And secondly, upon the ground that the facts alleged in the return were insufficient to establish a want of jurisdiction in the commissioner.

In 1848 the legislature provided for the appointment of an auditor of the canal department and transferred to him the powers and imposed upon him the duties in relation to the canals, originally exercised and devolved upon the comptroller, with a single exception. (*Laws of* 1848, 272, §§ 1, 2.) It was the duty of the comptroller prior to the passage of this law, to superintend the fiscal concerns of the state; to draw warrants on the treasurer for the payment of all moneys directed by law to be paid out of the treasury; but no warrant could be drawn unless authorized by law, and every warrant must refer to the law under which it was drawn. He was to countersign and enter all checks drawn by the treasurer and all receipts for money paid to the treasurer; and no such receipts were evidence of payment unless so countersigned. (1 *R. S.*, 170, § 1 *subd.* 9; § 4.)

In giving a construction to these provisions, we are not embarrassed by consideration of the official rank of the parties, whose views may chance to differ in respect to their respective rights and obligations. The comptroller

is, in official station at least, the equal of a canal commissioner.

If the draft had been drawn before the creation of the office of auditor, had the comptroller a right and was it his duty to judge for himself of its legality?  Or was he restricted to the form of the instrument, and if that was correct, bound to give it effect by drawing his warrant on the treasurer, whatever might be his own opinion, or whether *243]  *in fact it was or was not authorized by law?  If the practice of the department is any evidence of the law, there can be no doubt upon the subject.  And there is as little in the provisions of the statute.  They declare that no "warrant shall be drawn unless authorized by law, and every warrant shall refer to the law under which it is drawn."  (1 *R. S.*, *supra*.)  The warrant was to be drawn by the comptroller, accompanied by a reference, which that officer would find some difficulty in making if he honestly believed that there was no law whatever by which it was authorized.

Even if the law providing for the draft was peremptory, leaving to the fiscal officer of the state no discretion as to its payment, he must, notwithstanding, ascertain the existence of that law and refer to it upon his warrant.  And so in every other case.  The statute requires a similar reference upon the part of the commissioner.  But this is not conclusive upon the comptroller.

The draft is the act of the commissioner, and the memorandum upon it his determination as to the particular statute authorizing the power exercised.

The warrant, on the other hand, is the act of the comptroller, and the reference is a summary of his own opinion and not that of the commissioner as to the source of his authority.  In a word, the legislature have prohibited the draft of a warrant on the treasurer without authority of law ; and to make the prohibition more emphatic have directed the comptroller, in every case in which he assumes to act, to specify in writing the particular law upon which

he relies for his justification.  To discharge this duty he must be satisfied that a law exists, and that fairly construed it authorizes the act required; and a decision upon those questions is a judicial act, whether performed by an executive officer or any other.

The same duty is imposed upon the auditor by the law of 1848, not only in general terms, but the language of *the Revised Statutes above quoted, is copied into the 11th and 12th sections of the act.  (*Laws of* 1848, [*244 *supra.*)  He is secretary, ex-officio, of the two canal boards; in all other respects his powers in respect to the canals are the same as those *formerly* vested in the comptroller.  He is the custodian of all papers pertaining to the duties of the boards above mentioned.  The canal commissioners and their subordinates account to him, the superintendents are to be removed when he is dissatisfied with their accounts, and the payments from the collectors enforced by his warrant, and all moneys from the canal fund must be drawn on his warrant, and as the head of the canal department he reports directly to the legislature.  That an officer, clothed with powers thus extensive and complicated, should differ in opinion with a canal commissioner, as to the existence or construction of a law, may be unfortunate but can hardly be deemed presumptuous.

The second question presented is whether the auditor's refusal was justified by the facts appearing upon the record.  This depends upon the fact whether the injury to Post, the payee of the draft, was occasioned by a permanent or temporary appropriation of so much of the waters of the Black river as were used to supply the Black river and Erie canals during the periods mentioned in the writ.  The canal appraisers have exclusive jurisdiction of " all claims for damages on account of any lands, waters and streams appropriated to the use of the public, " subject to an appeal to the canal board.  (1 *R. S.*, 225, §§ 46, 51, 52, 60.)  By the act of 1833 (*Sess. Laws*, 261), " whenever the navigation of any canal is interrupted or endangered from a deficiency of

water, and when that deficiency continues after they have resumed the temporary use of the surplus waters leased on the level of the canal where the deficiency exists, then the canal commissioners shall have power to enter upon and use all lands, streams and waters in their judgment necessary to procure a temporary supply. By the 2d section *245] *of this act, the damages sustained by the owners of the waters used for such temporary purpose under the authority of the 1st section, may be agreed upon by the commissioner or engineer under his direction and paid by the former. (1 *R. S.*, 227, § 58.)

It is questionable whether the facts stated by the relator unexplained and uncontradicted, are sufficient to give the commissioner jurisdiction. The reference upon the draft is to the general appropriation bill of 1853, and not the act of 1833 as the authority of the drawer. It is not alleged that the navigation of the Erie canal was interrupted or endangered, or that the waters of the Black river were used to procure a temporary supply on account of any deficiency of water for the navigation of the Erie canal, or that such supply was necessary or proper in the opinion of the commissioner or the relator. Without such deficiency, actual or apprehended, which made a temporary supply proper or necessary, the commissioner had no more right, under the act of 1833, to appropriate the waters of third persons, than to convert their chattels. And an adjustment of damages in the one case would no more furnish a claim upon the state treasury than in the other. Without, however, dwelling upon the case made by the relator, that made by the return is free from ambiguity, and a full answer to the claim preferred by the former. The return refers to the act of 1836, which directed the canal commissioner "with all reasonable diligence" to proceed to construct the Black river canal and a navigable feeder connected therewith, which together, were to form a feeder for the Erie canal by conducting to the latter through their whole length, or by means of sluices around the locks of the Black river

canal, all the waters of that river that could reasonably be spared.

The defendant then avers the construction of the canal and feeder in pursuance of the act; the latter with a capacity of passing 16,000 cubic feet of water per minute, and that the *waters of the river were diverted to the feeder by means of a permanent and expensive dam built across [*246 the former for that purpose; that these works were designed to form a permanent and exclusive feeder for the Black river canal, and a permanent, though not exclusive one, for the Erie canal; that the waters so diverted were relied upon as the only permanent supply of the Black river canal, and as a permanent, though not exclusive supply for 37 miles of the Erie canal and the weigh lock at Utica. The return further alleges that the waters of the Black river have, since the completion of said works, been used and appropriated as a permanent supply and not for a temporary supply or purpose. That the injury to Post was not by reason of any increased quantity of water taken for any temporary supply or purpose by the commissioners, or either of them, but that the permanent use of the waters, by reason of the diminished quantity in the river, was the sole cause of the injury to the mill owner.

Upon this state of facts which are admitted by the demurrer, the auditor was right in his conclusion that neither the commissioner nor the engineer by his direction, had authority to adjust the damages, nor had the former the power or jurisdiction to make the draft in question. The act of 1833 which is relied upon, has no application to the case made by these parties. The deficiency of water for the purposes of navigation there mentioned, and which the commissioner may obviate by a temporary appropriation, cannot arise when the feeder, constructed with a view to a permanent supply, furnishes all the water required. The relator, as we have seen, does not intimare that the navigation of either of the canals was interrupted or endangered, or that the commissioner entertained that opinion or assumed

3 KERN.—16

to act upon it. The statement is that he diverted the waters of the river at the dam through the feeder. In other words, taking this equivocal averment in connection with the return, he suffered the waters to flow in the channel *247] *constructed for the purpose of conducting them to the Erie canal as a permanent supply for its navigation; and that the quantity thus required and obtained left no surplus in the river for the use of the saw mill. It is not alleged that a larger quantity of water passed through the feeder at the time specified by the relator, than at all other periods since its construction, and every presumption of that kind is negatived by the return. I know it is said that the state officers have never permanently appropriated the water of the Black river, but that temporary appropriations have been made from time to time, and the damages therefor adjusted with the separate owners. To this it may be answered, first: That the act of 1836, by inevitable implication, directs the diversion of all the waters of that river that can be spared for the use of the Erie canal. Such a diversion for public use is an appropriation as permanent as the object to be supplied. If the commissioners, in the performance of their duty thus enjoined, erred in their estimate of the quantity that could reasonably be spared, it would make no difference in the nature of the appropriation. Second, the relator has not alleged that the appropriation was for a temporary purpose; and third, that the defendant avers that it was permanent and not temporary. There is difficulty in assuming a fact as the ground of a decision which presupposes a violation of duty by a public officer, which the party demurring has. not averred and which the defendant has expressly denied. If, however, the practice of the commissioners has been as suggested, it was not authorized by the act of 1833, or. any other law to which we have been referred. The law of 1836 required them, with all reasonable diligence, to construct a navigable canal and feeder. To the completion of these works. water was as necessary as land, and this river

was the only source of supply for the former in the contemplation of the legislature. If the commissioners, under pretence of supplying a deficiency, can annually appropriate *the water necessary in all seasons to render the canal navigable, they may for the same reason make a fresh entry upon the land through which it passes, and thus divest the board of appraisers of all jurisdiction over the subject of damages. The statute of 1833 presupposes a canal whose navigation is interrupted or endangered by some failure in the ordinary sources of supply, and not one which is to be made navigable and continued in that state by temporary appropriations of all the waters necessary for those purposes, during the pleasure of the commissioners. [*248

Again, it was insisted that the draft being regular upon its face, the auditor would be protected and therefore should pay it. The law which made the auditor a check upon the commissioner had, as I apprehend, in view the protection of the treasury rather than the security of that officer. Besides, a mere ministerial officer will not be compelled to execute any process which was issued without jurisdiction in fact. A mandamus would not be awarded in such a case, it is believed, where the want of jurisdiction was admitted upon the record, although the process was regular upon its face.

We are of opinion that the judgment of the supreme court should be reversed, with liberty to the relator to withdraw the demurrer and traverse the return.

HAND, J., delivered an opinion the same in substance as the foregoing.

**Judgment reversed.**