PEOPLE ex rel. GRANNIS et al. v. ROBERTS.

(Supreme Court, Appellate Division, Third Department. November 15, 1899.)

1. PUBLIC IMPROVEMENT—UNBALANCED BID—ESTIMATES—MISTAKE—CONTRACTOR'S KNOWLEDGE—DISCLOSURE.

Laws 1895, c. 79, § 4, as amended by Laws 1896, c. 794, provided that all state canal work should be let to the lowest bidder, and that none of the work should be contracted for until the state engineer should have ascertained the quantity and character of excavating to be done, and also provided a statement thereof for the inspection of bidders, which should be used in determining the cost of the work. In making a statement of certain improvements, the engineer estimated a much less quantity of rock excavation than actually existed. A contractor inspected the site of the proposed excavation, and, observing the discrepancy, put in an unbalanced bid,—bidding a high price for rock and a low price for earth. His bid, on the proportions of both excavations as shown by the engineer's estimate, was the lowest, and he was awarded the contract. Held, there being no fraud or collusion, and the engineer having made an honest attempt to estimate the work, the mere fact that the contractor did not disclose the discrepancy did not invalidate the contract, though his bid was not the lowest on the actual conditions.

2. MANDAMUS—OTHER REMEDY.

Laws 1895, c. 79, § 5, provides that contractors who have performed work on the state canals shall be paid by the treasurer on a comptroller's

warrant to the order of the superintendent of public works, when certified by that officer to be needed. Code Civ. Proc. § 264, confers jurisdiction on the court of claims to try claims against the state. The comptroller refused to draw a warrant in favor of a plaintiff, on the order of the superintendent of public works, on the ground that the contract pursuant to which the payments were claimed was invalid. *Held*, that plaintiff's remedy by presenting his claim to the court of claims was not so adequate or complete (depending, as it did, on the future action of the legislature as to the payment of any judgment that might be recovered) as to preclude him from the remedy by mandamus.

3. SAME—RETURN—PLEADING.
    Under Code Civ. Proc. § 2077, providing that the forms and contents of returns to an alternative writ of mandamus shall be the same as in other actions; and section 2082, declaring that the proceedings after issue joined therein shall be the same as in other actions,—an objection that the complainant had an adequate remedy by another proceeding cannot be urged, unless pleaded in the return.

4. SAME—STATE COMPTROLLER.
    Under Laws 1895, c. 79, § 5, providing that contractors who have performed work on state canals shall be paid by the treasurer on a warrant of the comptroller drawn to the order of the superintendent of public works, when certified by that officer to be needed, mandamus will lie to compel the comptroller to issue a warrant on the treasurer for an amount certified by the superintendent of public works.

5. SUPERINTENDENT OF PUBLIC WORKS—STATE ENGINEER—DEPUTIES—POWERS.
    Under Laws 1895, § 5, as amended by Laws 1896, c. 794, providing that the superintendent of public works may from time to time pay contractors who have performed work on state canals, on certificates of the state engineer and surveyor; and Laws 1892, c. 683, § 61, authorizing the state surveyor and engineer to appoint deputies, and empowering them to perform all the duties of the state engineer and surveyor, except, etc.,—the superintendent was authorized to pay out funds on certificates signed by the deputy surveyor and deputy engineer.

Appeal from special term, Albany county.

Mandamus by the state, on relation of Charles W. Grannis and another, against James A. Roberts, as comptroller of the state of New York, to compel respondent to issue warrants in payment for canal improvements. From an order awarding a peremptory writ on the report of a referee, respondent appeals. Affirmed.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

John C. Davies, Atty. Gen., for appellant.
Baldwin & Magee (Frank Hiscock, of counsel), for respondents.

MERWIN, J. By chapter 79 of the Laws of 1895, provision was made for submitting to the people of the state, at the next general election, the proposition to raise $9,000,000 for the purpose of enlarging and improving the Erie, Champlain, and Oswego Canals. In the event of the adoption of the proposition, provision was made for raising the money by the issuing and sale of bonds of the state; and within three months after the issuing of bonds the superintendent of public works was directed to proceed to the execution of the work, which was to be done in accordance with plans, specifications, and estimates prepared and approved by the state engineer and surveyor. By section 4 of the act, as amended by chapter 794 of the Laws of 1896, it was provided that all the work should be done by

contract entered into by the superintendent of public works on the part of the state, after certain advertisements, and should be let to the lowest responsible bidder, giving such security as the superintendent may require and approve; that none of the work should be contracted for "until the state engineer shall have ascertained with all practicable accuracy, the quantity of embankment, excavation, masonry, the quantity and quality of all materials to be used and all other items of work to be placed under contract, and a statement thereof, with the maps, plans and specifications, corresponding to those adopted by the canal board, and on file in the office of the state engineer, is publicly exhibited to every person proposing or desiring to make a proposal for such work"; that the quantities contained in such statement shall be used in determining the cost of the work, according to the different proposals received; that no change of plan which shall increase the expense of any such work shall be made, without its submission to the canal board, and their assent thereto; that the superintendent, after bids are opened, may cancel all of them, and readvertise. By section 5 of the act of 1895, as amended in 1896, it is provided that the superintendent may, from time to time, upon the certificate of the state engineer and surveyor, pay to the contractor a sum not exceeding 90 per cent. of the value of the work performed. By section 6 of the act of 1895, $4,000,000 of the moneys realized from the sale of bonds is appropriated, to be expended to carry out the purposes of the act; "said sum of four millions to be paid by the treasurer on the warrant of the comptroller to the order of the superintendent of public works when certified by that officer to be needed from time to time in the prosecution of said work." An appropriation in like form is made by chapter 569 of the Laws of 1897. The proposition submitted to the people having been by them adopted, the superintendent of public works proceeded to carry out the provisions of the law. On the 23d day of January, 1897, in the name of the state, he made a contract with the relators for the performance by them of a certain portion of the work of the improvement on the Western Division of the Erie Canal, being the work to be done for a distance of about 17 miles. This contract was made after an advertisement for bids, and the relators were the lowest bidders. In the engineer's estimate of quantities, from which the bidding was made, it was, among other things, stated that the quantity of dry excavation of rock was 100 yards. In the proposal of the relators, and in the contract, the price for dry excavation of rock was stated to be $3 per cubic yard. It was provided in the contract that dry excavation of rock will include the removal of all solid or ledge rock and hardpan which, in the opinion of the resident engineer, cannot be plowed; that the resident engineer shall in all cases determine the amount or quantity of the several kinds of work which are to be paid for under the contract; that, in case the execution of the contract shall be suspended by the state for any cause, no claim shall be made for prospective profits on work not done; that the state reserved the right to increase or diminish the amount or amounts of any class of work from the amount shown on the bidding sheet, in which case the amount of work required shall

be done at the rates named in the contract, and no claim shall be made for damages or prospective profits by reason of such increase or diminution. The relators thereupon entered upon the performance of their contract, and monthly estimates of the amount of work done were from time to time made; and prior to April 13, 1898, the date of the first draft in controversy, there had been paid to the contractors by the comptroller, upon the orders of the superintendent of public works, for work done up to March 1, 1898, the sum of $157,932. This was 90 per cent. of the work done, according to the estimates of the resident engineer. In the estimate for work done up to May 1, 1897, there was included 310 cubic yards dry excavation of rock. In the estimate for work to August 1, 1897, this item had increased to 1,094 cubic yards, and it continued to increase so that in the estimate for work up to March 1, 1898, it reached the total amount of 9,056 cubic yards. According to the estimate of the work done up to April 1, 1898, there was then due the relators, of the 90 per cent. payable under the contract, the sum of $43,794, and for this amount the first draft in controversy was drawn. The estimate for work up to May 1, 1898, called for the further payment of $38,727, and for this the second draft in controversy was drawn. The estimate up to June 1, 1898, called for the further payment of $3,573, and for this the other draft in controversy was drawn. The dry excavation of rock had then reached the total amount of 20,132 yards. The work has never been fully completed, by reason of the exhaustion of the appropriation therefor, and the consequent suspension of the work. The amount that remains to be done does not appear. Upon presentment of these drafts to the comptroller, he declined to pay the full amount thereof, upon the ground that there had been an improper classification of rock. He subsequently paid portions of each draft, leaving a balance unpaid thereon of $33,228, which is the amount he is directed to pay in the order appealed from; and the interest thereon is allowed as damages, under section 2088 of the Code.

The main question upon the merits of this case is based upon the great disparity between the amount of the estimate of dry excavation of rock in the quantity sheet exhibited to bidders, and the amount as afterwards found to exist. In the return of the defendant and on the trial it was claimed by the defendant that, by the fraudulent procurement of the relators, a large amount of excavation was classified as rock excavation, when it should have been classified as dry excavation of earth, the price of which, under the contract, was 23¾ cents per yard. Upon this subject the referee has found that the classification complained of was made by the resident engineer,—the officer charged by the contract with that duty,—upon an inspection of the rock and hardpan as it lay in mass, and after applying proper tests to determine whether it should be classified as rock or earth, without any fraud or collusion on his part with the relators, and that such classification was just and fair to both the contractors and the state, and received the approval of the state engineer and surveyor. Upon the evidence, we find no good reason for disturbing this conclusion.

We come, then, to the consideration of the circumstances connected with the disparity between the estimate and the fact as to rock excavation, as they may have a bearing on the validity of the contract. We assume that the comptroller has a right to raise the question that the contract is, for any reason, illegal or invalid. People v. Schoonmaker, 13 N. Y. 238; Laws 1897, c. 413, § 4, subd. 5. It appears that in March, 1896, according to the instructions of the state engineer, and for the purpose of ascertaining the different kinds and amounts of work to be done, a preliminary survey of the locality in question was made, preparatory to making the estimates; that one of the assistant engineers discovered a large amount of rock and hardpan that would have to be removed, and his notes showing such facts were left in the office of the division engineer, but were mislaid, so that, when the division engineer came to make up for the state engineer the quantity sheet for exhibition to bidders, the notes showing the amount of rock excavation were not discovered, and the division engineer, after examining the completed cross sections that had been platted and calculated, and examining the papers or notes which he found in his office, and which showed no reference to rock, decided to put in 100 yards as the amount of rock. There was proof that neither the state engineer nor superintendent of public works had any knowledge or information that there was more rock to be excavated than was specified in the quantity sheet, and that the state engineer, in making the statement to the superintendent of the amount of rock excavation, relied upon the correctness of the information forwarded to him by the division engineer. The referee finds that the state engineer, prior to advertising for bids, ascertained with all practical accuracy the quantity of embankment and masonry, the quantity and quality of all materials to be used, and all other items of work to be performed, and that a statement thereof, with the maps, plans, and specifications, corresponding to those adopted by the canal board, were publicly exhibited to any one desiring to bid. It also appears that the relators, before bidding, went over the ground, were satisfied that there was rock to be excavated, did not estimate the amount, but thought there were a good many thousand yards. There were several bids, but it does not appear that there was any bid on dry excavation of rock lower than the bid of the relators. Nor does it appear that the bid of the relators, testing it by the quantities as they in fact were, was not the lowest bid. There was evidence on the part of the defendant that the fair market value or price of excavation such as was classified here as dry excavation of rock did not exceed $1 per yard, while on the part of the relators there was evidence that it was fairly worth $2.50 a yard. The referee finds that the contract was made without any fraud, connivance, or collusion on the part of the relators or any of the state officers, and that the execution of the contract was free from any fraud or collusion whatever.

It is claimed by the defendant that the contract was fraudulent in its inception, and especially so since it appears that the relators are attempting to recover so large an amount of money from the

state at an excessive price for the rock excavation. If the contract was valid, the question of price is not an open one. The state is bound to perform its valid contracts. The referee finds that there was no fraud in the inception of the contract, and there is nothing in the case to overcome that conclusion, unless the fact that the relators did not disclose to the state officers their information of the existence of a large quantity of rock constitutes fraud in law. Our attention is called on this subject to the case of In re Anderson, 109 N. Y. 554, 17 N. E. 209. That was a proceeding to reduce an assessment for a local improvement. The bid accepted was an unbalanced one, and, although the lowest upon the estimates presented, it was next to the highest upon the quantities in fact existing. The bid was 2 cents per cubic yard for rock excavation, and $1.62½ for earth excavation. This was said to be suggestive of fraud upon its face, and it was held to be a just inference from the facts that the contract was the result of fraud and collusion. The case here is materially different, and the subsequent case of Reilly v. Mayor, etc., 111 N. Y. 473, 18 N. E. 623, seems to be more applicable. That was an action against the city of New York by a contractor to recover for work done and materials furnished under a contract to grade a street. The estimates differed materially from the actual work done, and at the prices bid, if the actual quantities had been correctly stated in the estimates, the plaintiff's bid would have been the highest, instead of the lowest. It was held that the contractor had a right to the benefit of his own knowledge, honestly acquired, so long as he did nothing to mislead or deceive the city, although he knew the estimates to be erroneous, and, relying on his judgment, made an unbalanced bid which gave him the contract as the lowest bidder, while the result of the work showed that he was the highest; that the lowest bidder upon the estimates does not lose his right because the estimates are erroneous; that he may lose it through fraud, but, if guilty of none, the city cannot urge against him its own ignorance or error. The Reilly Case would seem to be decisive against the proposition that the failure by the relators to disclose their information, indefinite as it was, was a legal fraud. They did nothing to mislead or deceive the state officers, and were in no way responsible for, or connected with, the mistake or error in the quantity sheet. Neither party expected that the estimates were strictly accurate. The state in the contract made special provision for having the right to increase or diminish the amount of any class of work,—to be done, however, at the same rates. In the Reilly Case it was also held that the validity of such a contract, so far as affected by the law or ordinance requiring the quantities to be ascertained as near as possible, does not depend upon the accuracy of the officer charged with the duty of making the estimates, but upon an honest effort on his part to be accurate. Here the state engineer, the officer charged by the statute with the duty of ascertaining with all practicable accuracy, made an honest effort, no doubt, to be accurate. It is hardly claimed to the contrary. He had a right to rely upon the information received by him from the division engineer, whose duties are prescribed by statute (Canal Law; Laws 1894,

c. 338, § 52). The variance here is a large one, and the state is called upon to pay a large price for some of the work. Still, that is the contract, and the state, in its contracts with individuals, must be judged and must abide by the same rules which govern in similar cases between individuals. People v. Stephens, 71 N. Y. 527. It may be that the state might, upon discovery of the discrepancy, have obtained relief by stoppage of the work, or might, in equity, have obtained rescission, if applied for before performance. But that was not done. It appears in the case that the expense of the relators in carrying on the work is largely in excess of the amount that they have thus far received. The defense that the contract was invalid is not, I think, made out.

It is further claimed in behalf of the defendant that the relators are not entitled to a peremptory writ of mandamus, for the reason that they have an adequate and complete remedy by action, in that they have the right, under section 264, Code Civ. Proc., to file in the court of claims, and have there determined, any claim they may have against the state for breach of the contract in question. Assuming that they have such right, it is not clear that the remedy is so adequate or complete, depending, as it does, upon the future action of the legistature as to the payment of any judgment that may be recovered, that it would preclude a resort to the remedy by mandamus. Besides, no defense of this kind is set up in the return, which upon this subject is to be deemed an answer. Code, §§ 2077, 2082. The proceeding is treated as an action. That being so, this defense, to be available, must be set up in the pleading, and it is too late to first take the objection on the trial. Crisfield v. Murdock, 127 N. Y. 315, 27 N. E. 1046. The same reason for applying the rule exists in this proceeding as in an action.

It is further claimed that the action of the comptroller was judicial in its nature, and that he cannot be compelled by mandamus to decide in any particular way, or to audit the account claimed by the relators. This is upon the theory that the comptroller was the auditing officer. We think that he was not. Under the statute, the comptroller was not called upon to audit the account. That duty was not imposed upon him. The amount was definitely ascertained before the draft was drawn on the comptroller. The duty of payment was upon the superintendent of public works. The method of payment was by draft on the comptroller. The payment by the treasurer upon the warrant of the comptroller was to be made to the order of the superintendent, when certified by him to be needed from time to time in the promotion of the work. This was, in substance, done, and the comptroller had no discretion as to the amount.

It is further objected by the defendant that the certificates upon which the superintendent of public works acted in making, by the drafts in question, payments under section 5 of the act of 1895, as amended in 1896, were not signed by the state engineer and surveyor personally, but by the deputy state engineer and surveyor. By section 61 of the executive law (Laws 1892, c. 683) the state engineer and surveyor was directed to appoint a deputy, who may

perform all the duties of the state engineer and surveyor, except as commissioner, trustee, or member of any board. This authorized the deputy to execute the certificates in question.

It is further argued by the defendant that the large increase of the quantity of rock excavation involved a change of plan, and was not permissible without the assent of the canal board. The plan, so called, is not in the case. Under the specifications, all the material within the limits of the construction section, to certain lines and grades, was to be removed. This constituted the excavation contemplated by the contract. The plan was to remove the whole material, whatever it was, and it was not affected or changed by the fact that the relative quantities of the different kinds of material were different from what were supposed to exist.

No other questions are presented. No fault is found with the form of order. We assume that the award of a mandamus is limited, as specified in the report of the referee, to the amount unpaid on the drafts.

Order affirmed, with costs. All concur.