Louis L. Friedman, J.
Petitioner, Caristo Construction Corp. (hereinafter referred to as “ Caristo ”) has instituted an article 78 (Civ. Prac. Act) proceeding for an order against respondents, members of the Board of Education of the City of New York, and respondent Joseph R. Weiss, as Deputy Superintendent of Schools of the City of New York and Superintendent of Plant Design and Construction of the Board of Education, directing them to deliver plans and specifications to petitioner for the purpose of permitting petitioner to prepare a bid for the construction of Public School No. 154. Petitioner also prays that the Board of Education be directed to accept such bid and award the contract for such construction to petitioner in the event that petitioner is the lowest responsible bidder. The proceeding also prays that the court overrule and rescind a certain resolution of the Board of Education adopted on May 25, 1961, disqualifying petitioner from bidding on Board of Education work.
In a companion proceeding which will be decided simultaneously herewith, petitioners Mars Associates, Inc., and Normel Construction Corp. (hereinafter referred to as “ Mars-Normel ”) also ask that the same resolution adopted on May 25, 1961 be rescinded and that petitioners, in effect, be granted the same relief as that prayed for by Caristo.
While these proceedings were pending, the respondents advertised for bids for other school construction. Since the resolution which is here attacked barred petitioners from bidding upon that project, Caristo instituted a second proceeding, seeking the same relief with respect to the more recently advertised school construction program as was sought in its first proceeding. Mars-Normel, instead of instituting an additional or second proceeding, moved before this court for a stay of any bid openings or awarding of any contracts until the determination by the court of the then pending proceeding. By an interim order, the court stayed the opening of all bids with respect to Public School No. 154 until the determination of these proceedings. A second intermediate order, applied for by MarsNormel through its second motion for a stay, was also signed and entered staying the opening of bids or the awarding of any contracts until all proceedings affecting the resolution of May 25, 1961 had been completed.
In the two pending proceedings by Caristo and the one by Mars-Normel, the parties are the same, except that between *187 the institution of the first two proceedings by the respective petitioners and the second proceeding by Caristo, respondent Weiss in the first proceeding had been superseded as Deputy Superintendent of Schools by Bernard Donovan. Thus, in the second Caristo proceeding, Donovan is named as Deputy Superintendent instead of Weiss. Since the institution of all proceedings, the respondent members of the Board of Education have ceased to hold such office and their successor members of the board have been substituted as respondents in this proceeding.
An examination of the papers before the court shows that as part of their return, respondents submitted a copy of the resolution of May 25, 1961 adopted by the Board of Education. Although this resolution specifically contains the statement that it is based upon a report received by respondents from the Commissioner of Investigation of the City of New York, and it thus appears prima facie that the subject report was the basis for the action taken by the respondents, the report was not submitted as part of the return. What respondents did was to submit to the court the final conclusion which they reached, without submitting the evidence which was the basis for that conclusion. Obviously, the return was inadequate and insufficient. By reason of the public interest in school construction matters, and the necessity for a final determination of the questions posed by these proceedings, the court felt it expedient and desirable to direct that a hearing be held and to take proof with respect to the issues raised by the papers before the court, instead of acting peremptorily upon the petitions and the inadequate return made by the respondents. Unider such procedure, the court would be enabled to look into and examine the evidence upon which the respondents justified their action.
The hearings were held for approximately 10 successive court days during the month of September, 1961, and the minutes of such hearing comprise over 1,150 pages. Since all of the proceedings involved the same questions of law and fact and since they were all based upon the resolution of May 25, 1961, on its own motion, the court consolidated all proceedings for the purposes of expediency. Although separate decisions must be rendered as to each of the proceedings pending, the facts found by the court and the applicable law are exactly the same as to each of them with the one exception that as to Mars-Normel, prequalification had already been received for the construction of Public School No. 154 and was vacated by the resolution here attacked, while as to Caristo, it had not yet been so prequalified. Thus, although there will actually be *188 three separate decisions, the three proceedings will be discussed together in this determination, since all of the reasons for the court’s determination herein. set forth are exactly the same as is the case with respect to the other two proceedings.
A contractor who desires to do construction work for the Board of Education is required by law and the rules and regulations of the board to file an application for prequalification. Only after the contractor has been so prequalified, are plans and specifications supplied upon which said contractor may prepare and file a sealed bid. Upon receipt of such prequalification application, the Board of Education reviews the facts therein stated and then makes a determination as to whether in its opinion, the applicant is qualified on the basis of financial and other responsibility, as well as reliability, to do the kind of work which is to be contracted for. After having satisfied itself that the applicant possesses all of the necessary financial and other qualifications and that he is otherwise reliable to do the worlc, the board then determines that he is prequalified, and then and only then, are plans and specifications given to such person for the purpose of preparing a bid.
Caristo has been doing work for the Board of Education, as well as for other municipal agencies, for many years. It has been engaged in the construction of public projects since 1938. Since 1947, it has constructed school buildings for the Board of Education to the extent of approximately $162,000,000. All of the witnesses who testified, including the respondents and their employees, said that no fault had ever been found with any of its work prior to May 25, 1961. While there had been claims filed for additional compensation, and some lawsuits instituted with respect to those claims, it was pointed out at the hearing that the institution of such lawsuits were for the purpose of protecting Caristo against the time limitation provided for by law. None of these lawsuits ever went to trial and every claim was eventually adjusted. In some construction projects, it was found that the Board of Education was entitled to some credits, and instead of there being additional claims, the contract price was revised downward.
Mars-Normel was a competitor of Caristo, and was also highly regarded by the Board of Education for the competent way in which it performed its work. It too had performed school construction "work for the Board of Education over a period of many years, and the papers before the court show that many millions of dollars worth of work was performed. In one exhibit submitted in support of its application, Mars-Normel *189 points out that with respect to only the projects listed therein, its bids for the construction of public schools, as well as for other city agencies, were over $800,000 less than the next higher bids. In its proof before the court, Oaristo showed that since 1947, the contracts awarded to said Oaristo were in amounts which were approximately $5,000,000 less than they would have been if awarded to the next highest bidder.
In an affidavit submitted in support of its moving papers, Oaristo points out that because of its general reputation for submitting low bids for school construction work, all other contractors competing have kept their bids as low as possible in the hope of being the successful low bidder. It argues that by reason of all of these facts, its rejection from the field of qualified bidders will result in an additional cost to the Board of Education over a period of years, of many millions of dollars. Mars-Normel has taken a similar position.
With this reputation as a background, both petitioners filed applications with the respondents, requesting that they be prequalified to file bids for the construction of Public School No. 154. Mars-Normel was so prequalified. Before the board took any action with respect to the application of Oaristo, respondents adopted a resolution on May 25, 1961 affecting these contractors. It is that resolution which petitioners attack as having been the result of arbitrary and capricious action on the part of the members of the Board of Education. By said resolution, petitioner Oaristo was disqualified from bidding on Board of Education contracts, and petitioner Mars-Normel was not only disqualified from bidding on future contracts, but its prequalification as a bidder for the construction of Public School No. 154 was set aside and it was designated as being disqualified.
These proceedings are brought under article 78 of the Civil Practice Act. In opposition, respondents have submitted affidavits with respect to the claims made by petitioners, as well as the resolution complained of. The report of the Commissioner of Investigation was not submitted nor did respondents submit any of the minutes, formal or otherwise, of the proceedings before the board which resulted in the adoption of the resolution. It thus became incumbent upon the court to direct the hearing to which reference has already been made. Petitioners testified at said hearing and as part of their proof called the original respondent members of the board as witnesses. It is primarily from the testimony given by the members of the Board of Education that the court has come to its conclusion *190 herein, although all of the evidence and exhibits were taken into consideration.
The court was called upon to determine whether the respondents acted in accordance with the requirements of law and upon evidence sufficient to sustain the resolution which they adopted, or whether they acted in an arbitrary and capricious manner and in disregard of or without sufficient evidence before them. If the resolution was adopted upon sufficient legal evidence, then the court is powerless to disturb the board’s determination. If, on the other hand, it appears that the board acted without any evidence, or upon insufficient evidence, or that it failed to make inquiry which it should and could have made, or if it develops that such an inquiry would have revealed facts not otherwise known to the members of the board, then it may be deemed that the board’s actions were without foundation in either law or fact, and the court is empowered to take action accordingly. If in addition, the board acted for a purpose which it was legally powerless to accomplish, then again the board’s actions must be overruled by the court. With these requirements of law at all times before the court, the submission of evidence was restricted along the lines of the issues presented by the petition and the answer. Since the board conducted no hearing before it adopted its resolution of May 25, 1961, the factual background which led to the resolution became relevant. Such relevancy was only because it showed that a proper inquiry by the board into such factual background would have given them information which could have and undoubtedly would have led to a rejection of the proposed resolution on May 25,1961, instead of its adoption.
In the Fall of 1959, the Board of Education advertised that it was receiving bids for the construction of Public School No. 203 in the Borough of Queens. In due course, the board prequalified the petitioners Caristo and Mars-Normel as amongst those who were entitled to bid. By such prequalification, the board ruled, as it had on many other prior occasions, that these contractors were financially able to complete their contract, that they had the integrity, ability and capability and the manpower to perform the terms of the contract within the time provided therein, and that their reliability was beyond question. The testimony showed that the average number of contractors who submitted bids for this type of work ran between 4 and 8, although at times there were as many as 10 contractors who filed.
The bids with respect to the construction of Public School No. 203 were advertised to be opened on October 15, 1959. When *191 they were opened, it developed that both of these petitioners were tied low bidders, each having submitted a bid for $1,430,000. There is some dispute as to what occurred immediately thereafter, but the court finds the following to be the facts. Joseph Weiss, then Deputy Superintendent of Schools in Charge of Construction, immediately told petitioner Mars-Normel that he had the power to and was going to award the contract to petitioner Caristo. Mars-Normel protested against what it claimed was a usurpation of power by Mr. Weiss of the functions of the Board of Education. Although the law and the Buies of the Board of Education gave the power to the board to make the selection as between tied bidders, it is undisputed that the board had never exercised such power but had always resolved such questions of a tie bid by a drawing held in the presence of both bidders, and had awarded such contract to the winner of such drawing. When Singer, an officer of Mars-Normel, protested to Weiss against Weiss’ then announced determination that the contract would go to Caristo, Weiss insisted that he had the power to make such award. After some discussion between Weiss and Singer, Weiss telephoned to the office of Caristo’s attorney, Greenberg, but the attorney was out. Weiss then suggested to Singer that he go to Greenberg’s office and see if something could be worked out in the way of a joint venture. There were conferences between Weiss and Singer immediately after the bids were opened and again the following day. Singer met with attorney Greenberg, who, after conference with his client Caristo, informed Singer that Caristo refused to enter into any joint venture agreement. After continued negotiation, during which Singer indicated that he would appeal to the courts by way of legal proceedings from the determination which Weiss had announced that he was going to make awarding the contract to Caristo, pointing out that the gravamen of his proceeding would be that Weiss had no power to do so, a settlement was arrived at. In consideration of Singer (Mars-Normel) agreeing not to institute such lawsuit, Caristo agreed to pay to Mars-Normel the sum of $11,000 in repayment of the average expense incurred by Mars-Normel in preparing and submitting a bid. The record shows that there was some negotiation between the two petitioners before this figure of $11,000 was arrived at, but it is undisputed in this proceeding that based upon an average over-all cost to Mars-Normel, it cost that firm more than $11,000 for each successful bid submitted by it. The testimony shows that the average cost for submitting any one bid was less than that amount, but since Mars-Normel was not the successful bidder in every instance, the cost of submitting *192 unsuccessful bids was of necessity related to the over-all cost of submitting successful bids, and it was based upon this over-all cost that the figure of $11,000 was finally arrived at.
Attorney Greenberg indicated that he would inform Weiss that Mars-Normel was withdrawing its objection to the award of the contract to Caristo. Singer, however, protested that while he had no objection to such an end result, some pretence at a draw or a coin toss should be arranged for, so that other persons in the industry and the personnel in the Board of Education would not come to the conclusion that Caristo was selected because it was the more prominent of the two contractors. Greenberg agreed to such an arrangement and an appointment was made to meet at Weiss’ office the following Monday.
Pursuant to that appointment, the parties met with Weiss at his office. Weiss was told about the arrangements which had been made. He suggested that the attorney toss the coin, and after doing so, Greenberg announced that Caristo had won and that the contract was awarded to it. Weiss’ assistant, one Haut, was present while these proceedings were taking place, and when Greenberg announced that Caristo had won, Haut called attention to the fact that nobody had actually looked at the coin in order to ascertain the result of the toss. In speaking to Singer about that, Haut was told by Singer that $11,000 was being paid. This was the first time that such information had come to the attention of Haut and he promptly told Weiss about it, in reply to which Weiss said, “ That’s something between them, it doesn’t affect us.” Since it is undisputed that as Deputy Superintendent of Schools, Weiss was in charge of construction and, except for unusual questions which might arise, all determinations with respect to such construction were left entirely to him, Haut decided the matter was closed and so let it drop.
The contract was duly awarded to Caristo, and by means of some debit and credit arrangement involving Caristo, Greenberg, and Mars-Normel, the $11,000 was paid over. Before the actual award, however, Weiss decided to consult with Superintendent Theobald about the coin toss which had taken place in his office. There is no evidence that Theobald was ever told that the coin toss was a fictitious one, or that $11,000 was to be paid over. Superintendent Theobald told Weiss that he had no authority to conduct any coin toss nor to make a determination as between tied bidders, and he suggested that Weiss leave it to the members of the Board of Education to conduct the drawing. When the board was informed that there was a tie bid, the question of awarding the contract became part of their agenda and about *193 a week after Weiss had participated in the mock coin toss, the board itself conducted a drawing and Caristo was declared the successful contractor. In effect, all of the proceedings leading up to and including the mock coin toss were disregarded by the board, and it was an actual legal drawing which finally resulted in the award of the contract to Caristo.
The court finds, contrary to the position taken by the respondents in this proceeding, that the $11,000 payment by Caristo to Mars-Normel was in reimbursement of the expense incurred by Mars-Normel in bidding on the proposed construction job, and in settlement of a contemplated or threatened lawsuit which would have resulted in holding up the award of the contract to Caristo. Since it is a well-known fact that the costs of labor and material often change from day to day, and that spiraling costs sometimes result in a loss to a contractor rather than in a profit, any substantial delay caused to Caristo, through the institution by Mars-Normel of a lawsuit, might very well have resulted in a much more substantial expenditure than the $11,000 agreed upon. Mars-Normel accepted the payment in obvious recognition of the fact that although Weiss had no authority to make the determination as between tied bidders and to award the contract, that he was nevertheless the person in charge of the construction program of the Board of Education, and that despite his questionable authority, he had already stated that the contract would be awarded to Caristo. Mars-Normel had two alternatives. It could either carry its protest to the courts and thereby incur the displeasure of Weiss on pending construction work as well as possible future contracts, or it could take the easier way out, accept reimbursement for its expenses, and forget about that particular construction job. The fact that Mars-Normel chose the more practical approach rather than the strict legalistic approach is not cause for criticism, nor may it be designated as a fraudulent or corrupt act. Caristo, by the same token, also decided to take the means afforded to it to avoid a lawsuit and the delay in getting a construction contract which was then within its grasp. It may not be said that in making the agreement to or in paying the $11,000, Caristo acted in any corrupt or fraudulent manner. The actions of these two contractors were not only open and aboveboard, but were fully disclosed to the representative of the Board of Education with whom the contractors were dealing, and the fact that the respondent members of the board did not themselves become aware of the details of the transaction immediately, was certainly no reason to label the transaction as immoral or illegal or fraudulent. Acceding, as Weiss and *194 Caristo did, to the request of Mars-Normel that a spurious coin toss be held, was merely a face-saving device by which MarsNormel could continue to maintain its reputation in the trade as a contractor which was highly regarded by the Board of Education, and nonsensical as it was, cannot be considered as morally wrong.
Caristo got the contract and finished the job, and upon renegotiation, the bid price was reduced by approximately $9,000 by virtue of some changes in the work plan. Since the award of the contract referred to, both Mars-Normel and Caristo have been awarded other construction jobs after proper prequalification, and until the Spring of 1961, no question was ever raised by anyone as to their responsibility, integrity, or general reliability.
About the end of the year 1960 or early in 1961, the State Investigation Commission began to make inquiry into this question of school construction and school repairs. Since both of these petitioners had done most of the school construction work in the city, it was inevitable that they should be called as witnesses. In his position as Deputy Superintendent of Schools in Charge of Construction, Weiss and his assistant, Haut, were also called in. The inquiry continued to the point where the entire board, as well as many of its employees, ultimately became witnesses before the State Investigation Commission. The Commissioner of Investigation of the City of New York also began an inquiry into the question of school construction and school repairs and he too caused the testimony of the various persons involved to be taken. A great deal of newspaper publicity followed and public attention was drawn to the controversy involving this very important question of the condition of the public schools in New York City. In the offing at that time was the mayoralty election of 1961. The court cannot close its eyes to the well-known fact that at such a time, all who are interested in the eventual outcome of such an election seek either public approval for themselves or disapproval of those who are or will be their opponents. Charges are hurled by one side against the other, and eventually the condition of the public schools in the city became the subject of controversy. Eventually, as one member of the board put it during his testimony, the pressure was on and something had to be done. Disregarding completely the fact that the two petitioning contractors were vitally important to the school construction program of the City of New York because of their past excellent record of construction work, fair dealing, and general reliability for more than a decade last past, they were *195 immediately disqualified as possible construction contractors by seizing upon one isolated incident which in no way affected the interests of these respondents. As the evidence showed, the haste and the manner in which such disqualification was accomplished indicate not only an act which was completely arbitrary and capricious, but which disregarded entirely the financial and other interests of the citizens of the City of New York, because the respondents should have and must have recognized that the elimination of these two contractors would not only hold up the school construction program but would in addition cause the public a great deal of additional expense. In addition, it would have restricted the field of eligible contractors for all practical purposes to two firms.
Inspections of some of the public schools made by the officials and employees of the Board of Education, as well as the Mayor of the City of New York, revealed shocking and deplorable conditions. Disregarding completely the fact that these conditions of disrepair and neglect were confined to public schools constructed many, many years ago with which these petitioning contractors had nothing to do, they were included in the attacks which were made on many persons concerning the conditions existing in these public schools. As the various investigations by the State Investigation Commission and the city’s Commissioner of Investigation progressed, it became public knowledge that the ultimate decision as to who would be the Democratic candidate in 1961 for the office of Mayor of the City of New York might be contested in a primary election. Various reports were received by the Mayor from both the State Investigation Commission and his own Commissioner of Investigation, and amongst those reports was the one now in evidence, petitioner’s Exhibit 1.
Paul Screvane, the then Deputy Mayor of the City of New York, was the liaison between the office of the Mayor and the Board of Education, and after the report had been received by the Mayor, it was forwarded in due course to and for the attention of the members of the Board of Education. This report was received by the members about May 8, 1961. Copies were distributed by Harold F. Hay, secretary of the board, to each of the members, although there is some question in the testimony as to whether some of the members actually ever saw or read the report which had been sent to their respective offices. In accordance with the usual procedure of the Board of Education, Hay prepared the calendar of matters which were to come before the board at its regular monthly meeting to be held on May 25,1961. This calendar was always prepared on the Friday *196 preceding the Thursday meeting, and in the present instance, it was prepared on May 19,1961. It was the policy of the hoard to hold a private executive meeting of its members before holding a public meeting. The various matters on the public meeting calendar would be taken up in advance and the members would agree amongst themselves as to what action would be taken at the public meeting, subject to any other information which came to their attention at such public meeting. The calendar for the public meeting was widely distributed so that those members of the public who were interested in any of the items on such calendar would have an opportunity to come in and be heard by the members of the board.
On this Friday, May 19, 1961, Hay prepared the calendar in the usual fashion. The question of disqualifying these petitioners was not part of the agenda for either the public or the executive meeting. When the executive meeting started at 1:00 p.m. on the following May 25, 1961, this same question of disqualification was still not part of the agenda for either the executive meeting or the public meeting. It is undisputed that some time between 4:00 and 4:15 that afternoon, it was decided to add this item to the executive meeting agenda and to the public calendar for that same day. Obviously, neither Caristo nor Mars-Normel nor anyone else interested in the matter were notified that the subject was on the calendar and by reason thereof, no one had an opportunity to be heard. Within a period of some 10 or 15 minutes, Commissioner Adams, who was present at the executive meeting, suggested that since the members had received this report from the Commissioner of Investigation, that some action should be taken upon it, and so he proposed the resolution disqualifying the two contractors. Upon his urging, the resolution was adopted. Commissioner Lanza was present but refused to vote, although the minutes record him as having voted for the resolution. Commissioners Walsh and Taylor were not present at the meeting at that time. The reasons advanced by the members for their vote have been testified to on this hearing, and will be discussed further on in this opinion. Evidence as to such reasons was taken because there were no verbatim or official minutes of the proceedings at the executive session nor were there any verbatim minutes of the proceedings at the public meeting. When the executive session adopted the resolution, it was agreed to add the matter to the public calendar that very afternoon.
When that public meeting took place, this item was near the end of the action calendar. It is undisputed that the item was read aloud, and was immediately adopted in about one minute’s *197 time. No one spoke either for or against the resolution since no one had been previously notified that it was to be then considered. The minutes of this meeting of the Board of Education (not verbatim) show that the item was No. 19 on the agenda, there being all told but 26 items on the calendar of that day. Commissioner Adams recommended the adoption of the resolution, and it was immediately adopted. The resolution is printed in the minutes, and is followed by this statement: “ Commissioner Adams: In connection with this resolution which I had the honor to introduce, I should like to express appreciation for the cooperation and assistance the Board has received in this matter from the Mayor and his Office, and the Commissioner of Investigation, and, I respectfully request that it be recorded in the minutes of this meeting.”
On the basis of this statement, petitioners have contended throughout this proceeding that the board did not act independently and as an autonomous body as it is required and empowered to do by law, but that it was responding to a direction by the Mayor of the City of New York, made for the purpose of gaining political advantage in a then undetermined primary contest, that something be done against these contractors to take the so-called ‘ ‘ heat off. ’ ’ There is no direct evidence in this case to support such a conclusion, even though there is some testimony that some conferences were held between representatives of the Board of Education and representatives of the Mayor’s office. Commissioner Adams explained his gratuitous statement following the resolution as referring only to the co-operation of the Mayor and the Commissioner of Investigation in forwarding their report to the Board of Education. That there was pressure of one kind or another has been conceded by at least one member of the board, even though whatever pressure there may have been is of little moment in this case except as it relates to the manner in which the resolution was adopted and whether such manner was arbitrary and capricious.
Petitioners have raised the question of the authority of the board to adopt the resolution here attacked, without giving said petitioners notice of the proposed resolution and an opportunity to be heard. The law seems to be clear that petitioners were not entitled to notice of such a hearing, since an invitation to bid for a contract, as is the case here, is not a property right (Matter of Haskell-Gilroy, Inc. v. Young, 20 Misc 2d 294, affd. 10 A D 2d 629, motion for leave to appeal denied 10 A D 2d 717). If petitioners were actually possessed of a property right, then such a hearing would have been a prerequisite to the action taken by the board (see Matter of Hecht v.Monaghan, 307 N. Y. *198 461, 468). The law requires that all contracts for public works constructed by respondents be awarded after competitive bidding to the lowest responsible bidder. (Education Law, § 2556, subd. 10; General Municipal Law, § 103, subd. 1.) The bid may be restricted to those who shall have qualified prior to the receipt of bids according to standards fixed by the respondents. (Education Law, § 2556, subd. 12.) As a rule, the matter of determining the responsibility of a bidder is within the discretion of the respondents and should not be disturbed. However, when the discretion is exercised in a way as to indicate an abuse thereof, the courts will interfere and not permit such discretion to go unhampered. (Burland Print Co. v. La Guardia, 9 N. Y. S. 2d 616.) “ Judicial control of administrative conduct is often expressed by the requirement that it be reasonable ”. (Matter of Alpert v. Board of Governors of City Hosp., 286 App. Div. 542, 546.) The dictates of public policy require that all responsible bidders shall have the opportunity to compete, and accordingly devices or unreasonable actions by authorities which are designed or tend to limit the list of qualified bidders, are presumed to be injurious to the taxpayer and are illegal. A responsible bidder is one who possesses sufficient capital resources, skill, judgment, integrity and moral worth. (See Picone v. City of New York, 176 Misc. 967, 969.)
The respondents assert that petitioners are not responsible bidders since their moral worth has been negated (1) by entering into the agreement with Caristo which was illegal and against public policy; (2) by violating (a) petitioners’ certification and declarations that they were solely interested in their bid and (b) the provision in the Instruction to Bidders issued by respondents that the bidder may not withdraw its bid for 45 days of the day of the bid opening.
It is a settled rule that an agreement between contractors bidding for public work which tends to suppress or stifle competition is against public policy and void.(Atcheson v. Mallon, 43 N. Y. 147; Woodworth v. Bennett, 43 N. Y. 273; Marsh v. Russell, 66 N. Y. 288; People v. Stephens, 71 N. Y. 527; Sharp v. Wright, 35 Barb. 236; Baird v. Sheehan, 38 App. Div. 7, affd. 166 N. Y. 631; see New York City Tr. Auth. v. Jamaica Buses, 20 Misc 2d 659.)
One case has been cited by respondents in support of their argument that an agreement to withdraw a bid or not to press a bid would tend to stifle competition and be injurious to the public. (Conway v. Garden City Paving Co., 190 Ill. 89.) This case, decided in the State of Illinois, is distinguishable upon its *199 facts and is inapplicable to the present situation in view of the testimony given upon the hearing.
The court has already come to the conclusion that there was nothing about the agreement between Caristo and Mars-Normel settling a threatened lawsuit, which was in any way illegal or against public policy. The interests of the Board of Education were in no way affected by this agreement and, in fact, the final award of the contract was not made by reason thereof but on the basis of a subsequent drawing made by the Board of Education itself. Neither did this agreement in any way suppress or stifle competition, since it was not an agreement for collusive bidding. Respondents assert only that they were justified in disqualifying these petitioners because of the prohibition in the rules of the board against the withdrawal of bids prior to contract award (see Instructions to Bidders, par. 9) and because the prequalification statement requires that the board be satisfied that the contractor has ‘ ‘ general reliability to do the work in a satisfactory manner and within the time specified. ’ ’ (Prequalification Statement, p. 5, lines 17-21.) Great emphasis is laid by respondents upon the word ‘ ‘ reliability ’ ’ and on the fact that the board “ in declaring a prospective bidder to be prequalified * * * reserves the right, should the facts warrant it, to modify its judgment subsequently.” (Rules and Regulations of Board of Educ., p. 3.) Respondents contend that the adoption of the resolution of May 25, 1961 was justified because the facts referred to in the report of Commissioner Kaplan raised serious question that these contractors were in fact generally reliable. Despite the fact that the court concludes that these petitioners were not entitled to a hearing as a matter of right because an application for prequalification is not a property right, the question still remains as to whether the board acted in an arbitrary and capricious manner in adopting this resolution. The court concludes that even petitioner Mars-Normel had no property right despite the fact that it had been prequalified some eight days before the adoption of the resolution of May 25. However, the determination of that question becomes academic in view of the court’s ultimate determination of this controversy.
Since the return and answer submitted by respondents contained no minutes or return which showed the basis for this action, each of the respondents (other than Weiss) was questioned upon this hearing as to the reasons for his vote on the resolution. There are nine members of the Board of Education, and by stipulation in the record, it was agreed that board *200 member Reverend Gardner Taylor was not present at all when either the executive or the public meeting was held. Commissioner Walsh testified that he was present at the executive meeting for about 20 minutes, and the matter was not discussed at all up until the time that he left. He was not present at all at the public meeting. Since this item was not added to the agenda of the executive meeting until after 4 o’clock that afternoon, he did not even know that it was to be considered. He said that he was aware of the fact that a report had been received by the board from Commissioner Kaplan, and that he had seen the report, but he did not thoroughly read it.
Commissioner Lanza testified that he was present at the meeting; that he did not get a copy of Commissioner Kaplan’s report until that very day; that when it was suggested that the matter be added to the agenda, he protested on the ground that they were taking action in a hurry, that he thought it was precipitate action, and he suggested that action upon the resolution proposed by Commissioner Adams should be postponed until a later date. He said that members were walking in and out of the meeting during the discussion; that some other member, not identified, suggested rejecting the report; and that because of the manner in which the measure was being rushed through, he refused to vote on the resolution and that he did not vote. He was uncertain as to whether he was actually present when the resolution came up again for adoption at the public meeting.
Commissioner Cecile Sands said that she had received the copy of the Kaplan report; that there was no discussion at the meeting as to the reasons for the adoption of the resolution proposed by Commissioner Adams, and that the board merely decided to take some action. When asked as to her conception of the contents of the report, she said that she felt that petitioners had done an illegal act in arranging to submit a collusive bid. When her attention was called to the fact that such was not the claim made by the Board of Education and that there was no evidence whatsoever that any such collusion had ever taken place, she reiterated that she had apparently assumed erroneously that such was the case. She resumed the stand after the luncheon recess, and then changed her testimony by saying that she accepted Commissioner Adams’ statement that the contractors had done something wrong and she felt that she voted for the resolution because some punishment should be meted out to them because Commissioner Adams said they had been guilty of fraud. Although contending that one of the reasons for her action was because she as a member of the board had not received all of the information about the $11,000 *201 payment by Caristo to Mars-Normel, she admitted that except in unusual circumstances, all matters affecting construction contracts were handled only by Weiss. When asked whether she would have voted otherwise if she had known the facts as the court has now found them, she said she could not tell under such circumstances what her vote would have been. She agreed that the matter had been added to the calendar rather hastily. Her testimony showed, as did that of most of the others on the board who voted for the resolution, that they did so vote at the urging of Commissioner Adams, and that not one of them ever made an inquiry into the facts.
Commissioner Clausen testified that he voted for the resolution because he felt the petitioners should be punished for what they had done rather than because he had any question in his mind about their reliability in performing future contracts. There was no question in his mind that they did good work and would competently perform any contracts which they undertook. He was emphatic in stating that his vote was for punitive purposes only and had nothing to do with the question of reliability.
Commissioner Adams testified that he had received the report on May 10, 1961 and that he read it carefully. He never suggested adding this matter to the agenda until the executive meeting was already in progress on May 25, 1961 and he conceded that this item was added at about 4:00 or 4:15 that afternoon. He felt that the report was sufficient upon which he could come to the conclusion that the agreement between the contractors had been morally wrong. He came to a rather surprising conclusion in his statement that since Caristo was financially able to assume the obligations of the contract and yet pay Mars-Normel $11,000, it followed therefrom that Caristo would have been able to bid $11,000 less for this construction job. He gave no adequate explanation in support of his claim that Caristo would in fact ever have bid $11,000 less or would have accepted a contract for such amount, but assumed that since Caristo could spend $11,000 which it did not anticipate spending when it filed its bid, and yet assume the obligations of the contract, it could have reduced its contract price to the board by this sum of $11,000. When it was pointed out to him that eliminating these two contractors might be the cause for an increase in future construction costs, he agreed that he did not consider the question of expense to the public and that he completely disregarded it since he felt that the contractors were morally wrong in making their private agreement to have Mars-Normel withdraw from the competition.
*202 Commissioner Bensley said that all transactions between the board and any contractors were conducted with Weiss. Although there were six contractors who generally bid for this kind of work, four of them were getting practically all of it by reason of the low bids submitted by them. He said that the matter was added to the calendar late on that afternoon of May 25, 1961; that there was some talk with Weiss about it, because Weiss was present at at least part of the executive meeting; that the members of the board felt that they were under pressure at that time to do something because of the publicity and because of the many investigations which were going on, and so he voted for the resolution. He acted under that pressure, and although there was some protest from some members of the board against a blanket disqualification rather than a disqualification for a number of years, the vote was nevertheless taken.
Commissioner Bensley was asked whether it was the policy of the board to permit an award to be made to a particular contractor in the case of tie bids where the board received a communication from one of the tied bidders that he withdraws from the bidding and consents that the award be made to the other contractor, to which he answered, * ‘ I believe so, but I don’t recall that.” He was shown a record of the Board of Education made some time previously, which contained a record that such an instance had occurred, and he said that it did not refresh his recollection but that he presumed that such a thing did happen. Commissioner Clausen had testified the day before that there had been occasions when the board had permitted withdrawal of bids by a contractor, but only when the board had given permission.
Commissioner Bensley stated that he made his decision to vote on the resolution on the basis of the report from the Commissioner of Investigation which stated that a secret arrangement had been made between the two contractors. When it was pointed out to him that Weiss was charged with participating in the arrangement and that it was therefore not secret from everyone in the Board of Education, Commissioner Bensley was unable to answer how he would have voted on the resolution if he had known of that fact. Commissioner Bensley admitted reading that portion of the Kaplan report which said that Weiss had known about the entire situation, that he talked to Weiss and Haut about it, but never made a complete inquiry into all of the facts. Commissioner Bensley said that it was he who had suggested to the secretary of the board that the matter should be added to the calendar.
*203 Dr. Bank, vice-president of the board, testified that he had been chairman of the meeting in October, 1959 when the public drawing for the award of the contract for Public School No. 203 had taken place, and that Caristo had won the draw and been awarded the contract by reason thereof. Before the meeting and the draw had taken place, Weiss had talked with him at the executive meeting, and had stated that the contract should be awarded to Caristo. When the matter came up again on May 25, 1961 and was added to the executive calendar agenda for that day, Commissioner Adams proposed a resolution and stated that the actions of the contractors were corrupt and fraudulent. Without making any inquiry into the facts, Commissioner Bank voted for the resolution, influenced as he was only by Adams’ statement. The purpose of his vote was to censure or reprimand the contractors for what they had done, and not because of any question in his mind as to their general reliability or their qualification to perform the terms of their contract.
President Charles H. Silver testified that he was present at both the executive session and the public meeting. He had received Commissioner Kaplan’s report, which he read sometime between May 19, 1961 and May 24, 1961. He listened to what Commissioner Adams and Commissioner Bensley had to say about the matter and then decided that he should vote for the resolution in order to punish these contractors for what they bad done. Commissioner Adams insisted that the conduct of the contractors was unethical, and even though President Silver knew very little about the details which led to the introduction of and the adoption of the resolution, he voted for the resolution, saying, “ What else could we do? ” President Silver was asked the direct question whether he felt that despite the transaction involving the $11,000, petitioners Caristo and MarsNormel would properly perform any other contracts awarded to them, to which he gave an affirmative answer. Thus, his testimony showed that he was not at all concerned about the general reliability or the qualifications of these contractors to perform any future contracts which might be awarded to them.
Some of the members of the Board of Education, as well as Hay, the secretary thereof, remembered that Weiss was present during at least a portion of the executive meeting. There was some testimony that at one time Weiss said to the members of the board that they should disqualify these contractors or fire him [Weiss] and that Commissioner Adams replied that Weiss was himself involved and had better keep quiet. The testimony also showed that the conversations during at least *204 part of the meeting were to the effect that the board should take some action in view of the fact that the State Investigation Commission had been conducting investigations about school construction.
Dr. John Theobald, Superintendent of Schools, said that he was not present at the May 25 meeting although he is considered a nonvoting member of the board. He first heard about the coin toss from Weiss in a telephone conversation held on a Sunday in October of 1959, and he advised Weiss that only the board could make the determination in the case of tie bids. Dr. Theobald said, however, that neither Weiss nor anyone else ever told him that the potential lawsuit between these two contractors had been ' settled by an agreement to pay $11,000, nor did he know that the coin toss was a spurious one.
Vincent Caristo, president of petitioner Caristo, testified that he has been building various public projects since about 1937; that since that time he has done public school work in the amount of about $162,000,000; that he has never been involved in any litigation except the usual litigation arising out of claims, which were always settled; that he always corrected any defects in construction which were called to his attention; that he was never behind in his time schedule; and that he performed all of his work in an adequate and competent manner. It was evident from his testimony, as well as the testimony of all of the other witnesses, that he was highly regarded by everyone in the Board of Education as a competent and efficient contractor and that no aspersions had ever been cast upon his reputation as such a contractor until the facts about the arrangements resulting from the tie bid were brought to public attention.
Martin Singer, vice-president of Mars-Normel, testified about what took place in October of 1959. Shortly after the original bid was opened and it was determined that Mars-Normel and Caristo were tied, Weiss told him that the award was to go to Caristo. When Singer protested, Weiss insisted that he had the right to make the determination. The other facts leading up to the final award to Caristo have already been referred to and will not be repeated here. However, his testimony leaves no doubt that Weiss was told shortly after the opening of bids, that any attempt on the part of Weiss to make a determination without action by the Board of Education, would lead to a lawsuit by Mars-Normel against both the Board of Education and Caristo. This, of course, would have had the effect of holding up any award to Caristo and it was undoubtedly this threat of a lawsuit which led to the suggestions by Weiss that a joint venture be entered into, and which ultimately led to the *205 agreement by Caristo to reimburse Mars-Normel for the expense which it had incurred in preparing and submitting the1 bid. Singer said that his only reason for agreeing to the suggestion that he withdraw was because he did not want to antagonize Weiss, having in mind future contracts with the Board of Education.
Max E. Greenberg, attorney for Caristo, testified that he had been the medium through which the threatened litigation was settled by an agreement to pay $11,000. He said that Singer insisted on the formality of the toss with the understanding that Weiss would then have the right to award the contract to Caristo. He said that he called Weiss and told him about the arrangements which had been made, except that Weiss was never told about the $11,000. However, it is apparent from the testimony that Weiss at least knew that there was a consolation prize which was to be given to Mars-Normel, and that he knew from Haut immediately after the toss had taken place that Singer had said something about the payment of $11,000.
What caused the Board of Education to decide suddenly to add this matter to the May 25,1961 calendar has not been fully explained either in the papers submitted by respondents or in their testimony before the court. The members of the board had the report of the Commissioner of Investigation in their possession about 10 days before the May 25 calendar was prepared and about two weeks before the meeting took place. Yet it was only long after the executive meeting had been under way, in fact when it was almost concluded, that it was first decided to take action. It may be that the explanation is found in the testimony of Commissioner Bensley, who said that they felt that something should be done because they were under pressure. It has not been explained whether the pressure was that of those involved in the then forthcoming primary campaign or the pressure resulting from the investigation being conducted by the State Investigation Commission. Petitioners have argued that someone had to be made ‘ ‘ the goat ’ ’ to relieve the members of the board of the pressure upon them, and that these petitioners became the victims of the occasion. Petitioners have also argued that the pressure was exerted by the Mayor of the City of New York because of the then pending primary campaign. They based this argument upon the comments made by Commissioner Adams after the resolution was formally adopted at the public meeting, although Commissioner Adams’ explanation was that he was merely thanking the Mayor and the Commissioner of Investigation for forwarding the report to the members of the board. Whatever the pressure *206 may have heen, the evidence is convincing that some circumstance made respondents come to the conclusion that it was imperative that immediate and speedy action be taken on the day of the meeting, although they must have recognized that in adding this matter to the calendar without prior notice, they were departing from the usual and normal procedure.
Hay, secretary of the board, testified that there had been other occasions when matters were added to the calendar, and there seems to be nothing in the rules of the board or the statutes which forbids the board to do so. However, the precipitate action which was taken must be considered in relation to whether the resolution here attacked was adopted after careful deliberation by respondents or, as petitioners contend, arbitrarily and capriciously.
Certain facts are without dispute, since the members of the board themselves testified to them, and as to those which have been controverted, the court finds that the evidence can lead only to the following logical conclusions.
a. The resolution was not part of the agenda of the May 25 executive or public meetings, but was added at almost the last moment and without notice to anyone.
b. Although the report of the Commissioner of Investigation had been sent to the desks of each of the members, it had not been read by some of them except briefly, and at least one member had not read it at all before the resolution was proposed.
c. None of the members ever asked for or received the minutes of the hearings before the Commissioner of Investigation which formed the basis for the report and thus could not and did not consider whether the report was based upon good and sufficient grounds.
d. All of the members assumed that the facts stated in the report were true, without either reading the minutes or conducting an independent investigation to ascertain what the actual facts were.
e. Some of the members voted for the resolution because Commissioner Adams was “a reputable attorney” and they depended upon his opinion and followed him blindly, without considering it necessary to make any inquiry.
f. At least one member of the board thought she was voting for the resolution because the contractors had been guilty of collusive bidding.
g. Out of the nine members of the board, three were not present or did not vote (Commissioners Taylor, Walsh and Lanza — Commissioner Lanza is recorded as voting but testified he did not do so). One member (Commissioner Sands) voted for the *207 resolution because she thought that the contractors were guilty of collusive bidding. Three members (Commissioners Clausen, Bank and President Silver) voted for it in order to punish the contractors for what they had done. One member (Commissioner Bensley) voted for it because he felt the board was under pressure. Commissioner Adams voted for it because he felt the contractors were morally wrong and had been guilty of fraud.
h. None of the members, with the possible exception of Commissioner Adams, whose testimony was not very definite on this score, were at all concerned about the reliability of the contractors to properly, diligently, expeditiously, or competently perform any future contracts. In fact, President Silver affirmatively stated that in his opinion the contractors would do good work on any future contracts.
i. The contractors were well known to the board, had done many millions of dollars of work, and their competence, honesty, and integrity in the performance of their contracts, general reliability, financial responsibility, and other factors necessary to fully perform their contracts had never previously been challenged.
j. The difference between the bids of these contractors over the many years during which they had been performing Board of Education work, and the bids of the next higher bidder, effected a saving to the Board of Education of about $6,000,000.
k. That although there were at times as many as 8 or 10 bidders for this type of work, most of the work was done by only 4 general contractors, and the elimination from bidding of the petitioners, Caristo and Mars-Normel, restricted the field for all practical purposes to but 2 contractors, thus eliminating the effectiveness of the entire theory of public competitive bidding.
Those members of the board who voted for the resolution because they sought to punish the contractors usurped their authority in so doing. They were charged with the responsibility of determining whether the contractors were qualified to assume the responsibility of the construction job. They had no right to determine whether these contractors should be punished for some alleged misfeasance or malfeasance nor to impose any punishment therefor. Their testimony during the hearings that their purpose in voting for the resolution was to impose a punishment emphasizes the lack of consideration which they gave to the question before them. In determining the question here involved, the court has the right and the obligation to take into consideration the interests of the public *208 (International Meters v. City of New York, 101 N. Y. S. 2d 208; Grace v. Forbes, 64 Misc. 130; Warren Bros. v. City of New York, 190 N. Y. 297). "Where the board has exceeded its authority, the court has a right to step in (Matter of Schwab v. McElligott, 282 N. Y. 182).
Although petitioners have urged that the insufficiency of the return justified a peremptory direction sustaining the prayer for relief, the charges and countercharges made and the consequences to the public resulting from this determination are sufficiently important to have justified the court in conducting a full investigation and hearing as to the matters involved (Matter of Heaney v. McGoldrick, 286 N. Y. 38). While the court has no right to make findings of fact based upon new evidence submitted to the court which was not submitted to the original tribunal, it may nevertheless make inquiry with respect to the facts found by the tribunal, and is certainly empowered to make inquiry where the tribunal itself failed to do so. Such power to conduct such a hearing is inherent in the powers of the Supreme Court (Matter of Newbrand v. City of Yonkers, 285 N. Y. 164).
On the facts in this proceeding, the court feels that the contractors should not have been disqualified. Certainly, MarsNormel, which had already been prequalified, should not have been thereafter disqualified. These contractors were undeservedly vilified and injured in their reputations because of the then existing atmosphere, and public indignation about the condition of disrepair of many old public school buildings, for which they were not in the least responsible. Petitioners were pilloried in some segments of the press, their officers were held up to the members of the public as being unworthy of public trust and confidence, and they were otherwise slandered and libeled in many ways. No consideration was given by the respondents to the fact that millions of dollars of public funds would be wasted if these contractors were disqualified, and the speed with which the action was taken was the direct antithesis of careful and deliberate consideration.
In a matter such as this, the interests of not only the petitioners are involved, but the interests of the public at large must also be considered. Removing these two contractors from the right to bid deprives the public of the services of two eminently qualified contractors of unimpeachable reputations, who have never been sued by reason of the work which they performed until after this entire question had become a matter of public controversy following the May 25, 1961 meeting and the adoption of the resolution thereat; who between them have done *209 more than half of the public school construction in the City of New York; and whose disqualification has long delayed the very much needed school construction in this city. Their disqualification narrowly restricts the field of competition, thus depriving the public of the benefits derived from the entire principle of public letting through sealed bids. Considered in its entirety, the court can come to no other conclusion but that the actions of the respondents were arbitrary and capricious, based upon no legal evidence at all but upon a hearsay report, and that the resolution adopted by the board on May 25, 1961 must be set aside.
Only part of the record has been discussed in this opinion, but in coming to its conclusion the court has considered all of the papers submitted and the evidence taken as well as the applicable cases.
The court has used the term respondents throughout this opinion. "Wherever respondents are referred to, the court has reference to the original respondents in this proceeding who constituted the Board of Education, the members of which are now out of office. The present respondents, substituted for such original members of the board, have had no part in any of the proceedings referred to herein. However, as to such new members of the Board of Education, now respondents in this proceeding, they will of course be bound by the directions of the court to be made in the order which is to be entered herein.
Accordingly, on all of the papers and testimony taken before the court, the petition is in all respects granted. The interim stay granted by this court pending this determination is in all respects vacated.